PER CURIAM.
 

 Manuel Antonio Rodriguez appeals the circuit court’s order denying his motion to vacate his convictions of first-degree murder and sentences of death and also petitions this Court for a writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. Y, § 3(b)(1), (9), Fla. Const. Rodriguez raised a significant number of claims in his postconviction motion, and the circuit court held two separate evidentiary hearings on the claims requiring evidentiary development. This Court, having reviewed the record in the original trial and on postconviction and having held two separate oral arguments, has determined that none of the claims individually or collectively warrant relief. As more fully explained in this opinion, we affirm the circuit court’s denial of postconviction relief. We also deny ha-beas relief.
 

 'FACTS
 

 Direct Appeal
 

 The appellant, Manuel Antonio Rodriguez, was convicted of the first-degree murders of Bea Joseph, Sam Joseph, and Genevieve Abraham, which took place in Miami. The facts of this case are more fully set forth in our opinion on direct appeal.
 
 See Rodriguez v. State,
 
 753 So.2d 29, 33-35 (Fla.2000). Briefly, stated, in December 1984, Sam Joseph, Bea Joseph (Sam’s wife), and Genevieve Abraham (the
 
 *280
 
 Josephs’ friend) were found murdered in the Josephs’ apartment. “When Abraham was found, her wedding band, diamond watch, and diamond earrings were missing. There was no sign of forced entry into the apartment, but the apartment was in disarray.”
 
 Id.
 
 at 33. Each victim “died quickly from gunshot wounds to the head.”
 
 Id.
 
 at 33-34.
 

 Sam Joseph was Rodriguez’s landlord. Rodriguez lived with his girlfriend, Maria Malakoff, in the same apartment building as the Josephs and often did odd jobs for them in their apartment. He was suspected of being involved because of several calls that he made to the police as a “tipster” after the murders.
 
 Id.
 
 at 34. However, the police did not have sufficient evidence to charge him at that time.-
 

 In 1992, Rafael Lopez contacted police and told them that his brother-in-law, Luis Rodriguez,
 
 [1]
 
 had confided to him that Luis and his friend, Manuel Rodriguez, committed the murders. Police contacted Luis, who eventually gave a formal confession in which he implicated both himself and Manuel Rodriguez. The police also arrested and questioned Rodriguez, who gave numerous conflicting accounts. .Rodriguez finally admitted he was present at the time of the crime and helped Luis gain access to the Josephs’ apartment, but “contended that the robbery and murders were committed by Luis and Luis’s brother Isidoro, and that he had simply acted as a lookout.”
 
 Id.
 

 Although it was Rodriguez who had the prior relationship with the victims and lived in the same apartment building, no physical evidence linked him to the murders. His codefendant Luis, who pled guilty to second-degree murder, testified against him at trial and was a key witness:
 

 At trial, Luis testified that in 1984 he was living in Orlando. He stated that Manuel called him and asked if he was interested in making money by assisting Manuel in committing a robbery. Manuel told Luis that Luis would be the lookout and that Manuel would do all of the work. Luis flew to Miami and met Manuel. They went to the Josephs’ apartment; Manuel knocked on the door and told Sam Joseph that Malakoff and the children were being held hostage and that they would be released only
 
 if
 
 the Josephs gave him money. Manuel then forced himself into the apartment. Luis followed and shut the door.
 

 Once inside the apartment, Manuel, who had brought two pairs of rubber gloves with him, put on one pair and told Luis to wear the other pah* and not to touch anything in the apartment without the gloves. Sam Joseph offered to get money from the bedroom, but Manuel instructed Luis to look there instead. Luis found a gun in the Josephs’ bedroom, and Manuel became angry with Sam Joseph because he thought the offer to get money from the bedroom was actually a ruse to get the gun. Eventually, during the course of the crime, Manuel shot both Sam and Bea Joseph with a gun he had brought with him and then he ordered Luis to shoot Abraham with the gun Luis had found in the Josephs’ bedroom. Because Luis was scared, he did as he was told and then he fled. He stated that he did not receive any of the proceeds from the crime and flew back to Orlando the next day.
 

 Id.
 
 [2]
 

 Luis’s brother, Isidoro, also testified at trial and provided inculpatory evidence against Rodriguez:
 

 
 *281
 
 He ... stated that, soon after the murders, his mother contacted him to tell him that she had found coins and jewelry in a bag under her trailer and that Manuel and Malakoff had shown up looking for it. Isidoro stated that he was aware of the murders in the building and that he took the bag back to Orlando, where he threw it into a field. Isidoro’s mother also testified and confirmed Isidoro’s story.
 

 Id.
 
 at 35. Isidoro also provided documentation that he was working in another city at the time of the crime. Rodriguez’s girlfriend, Malakoff, testified, stating
 

 that she and Manuel had two children, one of whom died in 1984. She stated that members of her family did not like her or Manuel. She also said that Manuel was not angry with Sam Joseph at the time of the murders and that she did not believe that Manuel was involved in the murders. The State impeached her testimony through her sworn statement to the police in 1993, in which she said that Manuel had been angry with Sam Joseph and on the day of the murders had called him a son-of-a-bitch. Additionally, in her pretrial statement, she said that Manuel told her he killed Sam Joseph when Joseph reached for a gun; that he had made sure that Luis killed Abraham; and that Manuel made sure they were all dead.
 

 Id.
 
 The jury convicted Rodriguez of three counts of first-degree murder.
 

 In the penalty phase, the State presented evidence that Rodriguez had “seventy-one prior violent felony convictions (the contemporaneous murders in this case, twenty-three convictions of armed robbery, seventeen for armed kidnapping, eight for aggravated assault with a firearm, and numerous convictions for carrying a concealed weapon and possession of a firearm by a convicted felon).”
 
 Id.
 
 The State also presented evidence that Rodriguez was on probation and parole at the time of the murders.
 

 Both the State and Rodriguez presented the testimony of numerous psychologists and psychiatrists who had evaluated Rodriguez over the previous twenty years. While the experts believed that Rodriguez had some sort of mental illness, many questioned whether he exaggerated his symptoms and was malingering:
 

 Apparently, whenever Rodriguez was charged with a crime, a question of competency was raised and he was evaluated. Most of those who examined him agreed that he suffered from some sort of mental illness, but the testimony varied greatly in that some had previously found him to be incompetent and in need of hospitalization; others had found him to be malingering.
 

 Id.
 
 at 35. The testimony did establish a long history of drug abuse. The State also called Detective Jarrett Crawford, who testified as to hearsay statements from Alejandro Lago, an inmate who asserted that Rodriguez admitted he was exaggerating his symptoms.
 

 The jury unanimously recommended the death penalty for each of the murders. The judge sentenced Rodriguez to death for each murder, finding six aggravating circumstances: (1) the murder was committed while Rodriguez was under a sentence of imprisonment; (2) he had previously been convicted of violent felonies; (3)
 
 *282
 
 the murder was committed during the felony of armed burglary; (4) the murder was committed to avoid arrest; (5) the murder was committed for pecuniary gain; and (6) the murder was cold, calculated and premeditated (CCP).
 
 [3]
 
 The trial judge found no statutory mitigation, but found the following nonstatutory mitigation: “Rodriguez was and is mentally ill, he has a history of drug abuse and drug psychosis, and he is a good brother, loving father, and caring son.”
 
 Id.
 

 On appeal, this Court affirmed the convictions and sentences of death. As to the guilt phase, the Court reviewed a statement made by a detective during trial and an improper comment during closing argument — both which could have been interpreted as comments on Rodriguez’s right to remain silent. Nevertheless, we found that the comments constituted harmless error beyond a reasonable doubt.
 
 Id.
 
 at 36-39. As to the penalty phase, we held it was error to permit Detective Crawford to testify as to the statements from Alejandro Lago but held the error was harmless.
 
 Id.
 
 at 45.
 

 Postconviction Proceedings
 

 Rodriguez filed his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.850
 
 [4]
 
 on September 14, 2001, and his amended postconviction motion on April 16, 2004, raising numerous claims.
 
 [5]
 
 A
 
 Huff
 

 [6]
 

 hearing was held August
 
 *283
 
 24, 2004, at which the State conceded that an evidentiary hearing was necessary on six of the subclaims raised by Rodriguez. The trial court agreed to hold a hearing on the following claims: (1) trial counsel rendered ineffective assistance in failing to present evidence that Luis and Isidoro left Orlando together to commit the crimes; (2) trial counsel rendered ineffective assistance in failing to present testimony of Edgar Baez, an eyewitness, to describe the man he saw pull or take a woman into the apartment at the time of the crimes; (3) trial counsel rendered ineffective assistance in failing to present evidence that Luis, Raphael Lopez, and other members of Luis’s family possessed jewelry taken from the victims; (4) the State knowingly presented false evidence and did not disclose details of family visits that were allowed to Luis while he was in jail and that police knew about, and possibly encouraged, Luis’s engagement in sexual relations with his wife in the police station in order to obtain his favorable testimony; (5) the State knowingly presented false evidence that-it had not promised to assist Luis in obtaining parole in exchange for his testimony; and (6) the State knowingly presented false evidence that it did not threaten Luis into confessing by showing him fake indictments against his family. The trial court held an evidentiary hearing during which Rodriguez presented the testimony of Edgar Baez, trial prosecutor Abraham Laeser, Rodriguez’s trial counsel Richard Houlihan and Eugene -Zenobi, Luis’s trial counsel Art Koch, and Luis. The State presented the testimony of Officers Gregory Smith and Jarrett Crawford. The trial court entered a detailed order denying the six Claims on which the hearing was held and summarily denying the remaining claims. •
 

 Rodriguez raised six claims on appeal, most of which had a significant number of subclaims.
 
 [7]
 
 On initial appeal of the order, this Court held oral argument. By order, we affirmed the circuit court’s ruling that denied Rodriguez’s motions to disqualify the postconviction trial judge, but relinquished jurisdiction to the circuit court for further evidentiary proceedings on the following claims: (1) the State’s failure to disclose two letters that Willy Sirvas wrote to the prosecutor before the trial, alleging that he knew Luis would lie; (2) the State’s failure to disclose letters pertaining to potential impeachment of Alejandro Lago, a witness whose hearsay statements were heard by the jury in the penalty phase through Detective Crawford; and (8) various potential impeachment evidence relating to Isidoro.
 

 Another evidentiary hearing was held regarding these claims, at which Rodriguez presented the testimony of Willy Sir-
 
 *284
 
 vas (concerning potential impeachment evidence regarding Luis), Sergeant Kenneth Alan Singleton (concerning potential impeachment evidence regarding Isidoro), Detective John LeClaire (concerning potential impeachment evidence regarding Isidoro), Lieutenant Daniel Villanueva (concerning potential impeachment evidence regarding Isidoro), Diane Pattavina (concerning whether there were secret dockets pertaining to Isidoro), Jose Arrojo (concerning whether there were secret dockets pertaining to Isidoro), and Detective Greg Smith (concerning Lago), as well as Abraham Laeser, Richard Houlihan, and Eugene Zenobi. The circuit court subsequently denied relief on all of the additional issues. This Court held a second oral argument to review all arguments raised on appeal in both the initial and subsequent brief.
 

 ANALYSIS
 

 Rodriguez has raised numerous claims and subclaims on appeal.
 
 [8]
 
 We have reorganized the discussion of the claims presented by Rodriguez, focusing on those claims for which an evidentiary hearing was held. In analyzing Rodriguez’s claims, we first review the applicable law. We then address the following claims: potential impeachment material concerning Luis; potential impeachment material regarding Isidoro; trial counsel’s failure to present evidence implicating Isidoro in the crime; trial counsel’s failure to present the testimony of Edgar Baez; and potential impeachment material concerning Alejandro Lago. Finally, we review Rodriguez’s petition for a writ of habeas corpus.
 

 OVERVIEW OF APPLICABLE LAW
 

 The majority of Rodriguez’s claims assert either ineffective assistance of counsel, a Brady
 
 [9]
 
 violation, or a
 
 Giglio
 

 [10]
 

 violation. The law regarding these claims is well-established. As to ineffective assistance of trial counsel claims, Rodriguez must meet both requirements of
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 

 First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the
 
 *285
 
 defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
 

 Prejudice is met only if “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 at 694, 104 S.Ct. 2052;
 
 see also Porter v. McCollum,
 
 — U.S. —, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (emphasizing that courts “do not require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine’ confidence in [that] outcome” (quoting
 
 Strickland,
 
 466 U.S. at 693-94, 104 S.Ct. 2052)).
 

 To the extent that Rodriguez presents a
 
 Brady
 
 claim, he must show “(1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.”
 
 Riechmann v. State,
 
 966 So.2d 298, 307 (Fla.2007). To establish prejudice, the Court must ask whether “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Smith v. State,
 
 931 So.2d 790, 796 (Fla.2006) (quoting
 
 Strickler v. Greene,
 
 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Finally, to establish a
 
 Giglio
 
 violation, Rodriguez must show: “(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material.”
 
 Guzman v. State,
 
 868 So.2d 498, 505 (Fla.2003). In reviewing
 
 Brady
 
 and
 
 Giglio
 
 claims on appeal, this Court is “bound by the trial court’s credibility determinations and factual findings to the extent they are supported by competent, substantial evidence.”
 
 Jones v. State,
 
 998 So.2d 573, 580 (Fla.2008). However, this Court decides de novo whether the facts are sufficient to establish each element.
 
 See id.
 

 A. Potential Impeachment Concerning Luis Rodriguez
 

 We begin with the claims that the State withheld favorable evidence that would have impeached Luis Rodriguez. Any potential impeachment of Luis could have been significant because he was a main witness against Rodriguez and Rodriguez’s defense has been that, although he was involved, Luis was the main actor in the murder.
 

 Rodriguez alleges a violation of
 
 Brady
 
 because the State failed to disclose certain letters that would have called Luis’s testimony into question. He further asserts the State violated either
 
 Brady
 
 or
 
 Giglio
 
 because his trial counsel was not given the potential impeachment material that the police threatened to arrest Luis’s family, that Luis was provided with special accommodations as a benefit to ensure his cooperation, and that Luis was promised assistance in obtaining parole if he testified against Rodriguez. We discuss each of these claims and conclude that Rodriguez has not established a basis for relief.
 

 Failure to Disclose Letters to Prosecutor from Willy Sirvas
 

 We first address Rodriguez’s allegations of a
 
 Brady
 
 violation when the State failed to disclose two letters that jail inmate Willy Sirvas wrote to the prosecutor, prior to trial, alleging that Luis Rodri
 
 *286
 
 guez would lie. The first letter, dated August 10,1995, stated as follows:
 

 Dear Laeser-Hague:
 

 I’m in the same dormitory as inmate Luis Rodriguez # 93-65604. You have to ask for continuance on August 14. Rodriguez told me everything about the murders and he said that the state can’t pruebe [sic] him anything without a witness or pruebes [sic] that lead him to this murders. I will get in touch.
 

 The May 28,1996, letter states:
 

 Dear Mr. Abe Laeser and Andrew Hague:
 

 A year ago I wrote a letter to the state attorney office. And my letter ignore, [sic] Now, Mr. Richard Houlihan could use my testimony in court in reference to Luis Rodriguez lies to save his ass, is only one true, [sic]
 

 The postconviction court initially summarily denied this claim, but while the appeal was pending, defense counsel was finally able to locate Sirvas in Peru. Accordingly, this claim was part of the relinquishment proceedings, in which Sirvas testified via satellite. The postconviction court found that Sirvas’s testimony was not consistent with the content of the Sirvas letters and denied this claim as follows:
 

 For there to be a violation of
 
 Brady,
 
 the state must have suppressed evidence that was exculpatory and the Defendant must have suffered some prejudice as a result.
 

 [[Image here]]
 

 The 1995 letter was not signed it was unknown by the prosecution from whom it was sent. It would not have been helpful to defense counsel. Arguably, the 1996 letter should have been turned over. However, Defendant was not prejudiced as a result of the failure to turn over the 1996 letter. Counsel for Defendant testified at the hearing that they did not think that Luis was telling the truth. Luis was extensively cross-examined. Even if Sirvas was called to testify at trial, his oral testimony contradicted what he wrote in the letter. He did not have any credibility in front of a jury-
 

 Luis testified at trial. His plea agreement was known at that time and he was questioned at length about the agreement. It was clear Luis entered into the plea agreement to avoid the death penalty. Luis testified to that at the trial. The inconsistencies in his trial testimony from his initial confession were noted by the Florida Supreme Court on direct appeal.
 
 Rodriguez v. State,
 
 753 So.2d 29, 34 (Fla.2000).
 

 If any
 
 Brady
 
 violation occurred, it was not material and did not prejudice the Defendant’s ability to investigate or present other aspects of the case.
 

 Although we disagree with the court’s conclusions regarding whether this was favorable evidence that was not timely disclosed, we ultimately agree that Rodriguez has not shown prejudice.
 

 During the evidentiary hearing on relinquishment, Rodriguez clearly showed that the prosecutor failed to disclose these letters. Laeser admitted that he received these letters before the trial but did not turn them over to the defense. The first letter was unsigned so Laeser testified that he did not turn this letter over because he did not know who wrote it. As to the second, signed letter, Laeser testified that he did not turn the letter over to the defense because he knew that he would not call Sirvas, and the letter mentioned only Luis by name. Laeser testified that he thought the letter was relevant only to Luis’s trial, and Luis had already entered a plea.
 

 Rodriguez also called Willy Sirvas. Sir-vas knew Luis because he was in a cell
 
 *287
 
 next to Luis when they were both at the Metro West Jail. According to Sirvas, Luis talked about his case and stated that the State offered him a deal to testify against his codefendant because he was facing the death penalty and the State could not prove the charges unless Luis testified. Luis told Sirvas that even though he and his codefendant had a pact not to testify against each other, he would testify against his codefendant and blame it on him. However, Sirvas acknowledged that Luis did not describe the crime or how it occurred. On cross-examination, Sirvas acknowledged that he did not even know the codefendant’s name and that Luis never told him anything specific about the case.
 

 We agree with Rodriguez that both letters should have . been disclosed and
 
 strongly condemn such conduct.
 
 As this Court emphasized in
 
 Mordenti v. State,
 
 894 So.2d 161, 168-69 (Fla.2004):
 

 Brady
 
 requires the State to disclose material information within the State’s possession or control that tends to negate the guilt of the defendant.
 
 See Guzman v. State,
 
 868 So.2d 498, 508 (Fla.2003). Errors involving the suppression of evidence in violation of
 
 Brady
 
 present issues of constitutional magnitude.
 
 See Cardona v. State,
 
 826 So.2d 968, 973 (Fla.2002). As expressed in
 
 Brady,
 
 the rule is premised on the principle that reversal is warranted when the State fails to disclose to the defense exculpatory or impeaching evidence that prejudices the defendant, thereby undermining confidence that he received a fair trial:
 

 The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.... A prosecution that withholds evidence ... which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice....
 

 Cardona,
 
 826 So.2d at 972-73 (quoting
 
 Brady,
 
 373 U.S. at 87-88, 83 S.Ct. 1194, 10 L.Ed.2d 215).
 

 In this ease, the letters themselves strongly suggested that Sirvas possessed material impeachment evidence that defense counsel could have used in Rodriguez’s defense. The prosecutor explained that he did not turn over the first letter because he did not know who wrote it. Such a rationale for failing to disclose this evidence is disingenuous; the question of how to contact the author does not excuse the prosecution from disclosing favorable evidence. By its very nature, the letter was favorable to the defense. The prosecutor further asserted that he did not disclose either letter because they were relevant only to Luis’s trial. However, both letters involved the credibility of one of the State’s most important witnesses against Rodriguez. In fact, the second letter was clearly written in reference to this case and even included Rodriguez’s defense attorney’s name, stating, “Richard Houlihan could use my testimony in court in reference to Luis Rodriguez lies to save his ass.” Accordingly, the letters meet the first prong of
 
 Brady
 
 and should have been disclosed to defense counsel.
 

 While the record clearly establishes that the State wrongfully withheld favorable evidence, in order to be entitled to relief, Rodriguez must also demonstrate prejudice, which he has not done. Sirvas admitted at the evidentiary hearing that Luis
 
 *288
 
 did not tell him any of the specifics about the case itself and that he -did not even know the codefendant’s name. This testimony was directly contrary to some of the statements in his 1995 letter in which Sir-vas alleged that Luis had told him “everything.” Because his actual testimony contradicted his letters, Sirvas’s credibility is questionable.
 

 More importantly, Sirvas’s testimony at the evidentiary hearing shows that Sirvas did not know the underlying facts of the ease and who participated in the crime. Thus, Rodriguez would have been unable to show how Luis lied about Rodriguez’s involvement. When Sirvas was questioned during the evidentiary hearing, he was asked directly about why he stated in his letter that he believed Luis would lie. Sir-vas responded, ‘You know, he was lying because, you know, he was testifying, the defendant because I don’t even know his name or who he was. But he told me that the State is helping me, you know, how do you call it? A charge, you know, if I testify against my codefendant. That’s why he was lying, you know.” At no point did Sirvas provide any testimony that sufficiently explained why Sirvas thought that Luis would lie. Both his letter and his testimony assumed that because Luis decided to plead guilty to a lesser charge in order to avoid the death penalty, Luis would lie. The jury was aware that Luis had entered a plea in order to avoid the death penalty. Accordingly, the defense cannot show how Rodriguez was prejudiced by the failure to turn over the letters.
 

 Potential Impeachment Regarding Threats and Favorable Treatment
 

 In his next subclaim, Rodriguez asserts that the State violated
 
 Brady
 
 or
 
 Giglio
 
 because the State failed to disclose potential impeachment evidence that police threatened to arrest Luis’s family, that Luis was given special favors while in jail, including being allowed family visits outside the jail without supervision, that Luis was permitted to have sex with his wife while in custody, and that Luis was promised help in obtaining parole. The circuit court made credibility determinations based on testimony of the prosecutor and the detectives. As addressed below, there is competent, substantial evidence that supports the trial court’s factual findings. Further, Rodriguez has failed to show that he is entitled to relief on his claims.
 

 First, Rodriguez alleges that the State suppressed information that police threatened to arrest Luis’s family or knowingly presented false testimony that this did not occur. During the evidentiary hearing, Luis testified that when he was first questioned, the police informed him that they had picked up members of his family (his mother;- his brother Isidoro, his sister Maria Malakoff, and his former girlfriend Cathy Sundín) and showed him some documents that he thought were either indictments or confessions. According to Luis, the police further informed him that Rodriguez was blaming everything on Luis. Officers Smith and Crawford testified that they did not threaten to arrest Luis’s family. The circuit court denied this claim, finding that even if this allegation was true, Rodriguez failed to show prejudice because Luis was vigorously cross-examined at trial as to his motives for testifying against Rodriguez.
 

 We conclude that Rodriguez has failed to show that the police threatened to arrest Luis’s family if he did not cooperate. Moreover, even if this Court accepted his allegations as true, Rodriguez has failed to show prejudice — i.e., that “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 *289
 

 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1986 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The jury was presented with significant impeachment evidence against Luis, including his plea agreement and that he was given some preferential treatment.
 

 Second, Rodriguez alleges that the State violated
 
 Giglio
 
 and
 
 Brady
 
 by suppressing information that in order to obtain Luis’s cooperation in testifying against Rodriguez, Luis was provided with special accommodations, including unsupervised visits with his family and being permitted to have sexual relations with his wife while in jail. At trial, the jury heard testimony from Luis himself that he was permitted to have visits with various members of his family, he had informed his attorneys about these visits, and his attorney asked him to take pictures of the visits because the attorney could not believe that the visits were being permitted. Luis further testified at the trial that he had a meeting with his wife alone for about five or ten minutes and that during this time, he had sexual relations with her. However, he testified that he did not know if the police were aware of this. Trial defense counsel cross-examined Luis about these incidents at trial.
 

 At the evidentiary hearing, Luis testified that while he was unsure whether the police knew that he had sexual relations with his wife, the officers did suggest that, if he needed privacy with his wife, he should place a sticker over the peephole in the window of the door. The two officers testified at the evidentiary hearing that they were not aware Luis had sex with his wife and denied that they granted him permission to have sexual relations by using stickers to cover the peephole. The prosecutor testified that he did not knowingly present false testimony when the detectives testified at trial that they did not permit Luis to have sexual relations with his wife.
 

 The circuit court denied this aspect of the claim, finding that Luis’s statements lacked credibility and that the police officers provided credible testimony. This Court is “bound by the trial court’s credibility determinations and factual findings to the extent they are supported by competent, substantial evidence.”
 
 Jones,
 
 998 So.2d at 580. Upon review, we find that competent, substantial evidence supports the trial court’s factual findings. Luis’s recent testimony was contrary to his prior sworn statements at trial, and at times his testimony at the evidentiary hearing conflicted with other statements that he made during the hearing. Because Luis’s testimony was the primary support for this claim and his testimony was found to be not credible, Rodriguez is unable to establish the first prong of either a
 
 Brady
 
 violation or a
 
 Giglio
 
 violation. Further, even assuming the change of testimony that the police may have known about the sexual relations, the jury was already aware that Luis was being provided with special treatment and that the police knowingly permitted him to have some private time with his wife. Therefore, Rodriguez cannot establish either materiality or prejudice.
 

 Finally, Rodriguez claims that the prosecutor presented false testimony and failed to disclose that Luis was promised assistance in obtaining parole if he testified against Rodriguez. Although Luis was initially charged with first-degree murder and was facing the death penalty, he avoided this potential penalty by accepting a plea deal with the State in which he pled guilty to second-degree murder. At trial, the jury was informed as to Luis’s plea agreement, and Luis was vigorously cross-examined as to his motives for testi-
 
 *290
 
 lying against Rodriguez. The circuit court denied this portion of the claim.
 

 Other than vague, conclusory statements, Rodriguez failed to present any evidence to support his claim. During the evidentiary hearing, Luis testified that he thought he would be receiving assistance in obtaining parole based on some conversations he had “behind closed doors.” No specifics of these conversations were provided. Luis’s lawyer also was unable to provide any details as to specific assistance that Luis was to be given if he testified against Rodriguez. Luis agreed at the evidentiary hearing that the plea agreement expressly states that no promises were being made about his sentence. Because Rodriguez has failed to sufficiently support his allegation as to an undisclosed agreement, he is not entitled to relief.
 

 For the reasons addressed above, we deny this subclaim.
 
 [11]
 

 B. Potential Impeachment Concerning Isidoro Rodriguez
 

 We next address the claims regarding Isidoro, Luis’s brother, in which Rodriguez alleges violations of
 
 Strickland, Brady,
 
 and
 
 Giglio.
 
 Isidoro also gave inculpatory testimony against Rodriguez. Rodriguez’s defense at trial was that both Isidoro and Luis actively participated in the crime and Rodriguez was merely a lookout. Isidoro, however, established at trial that he was in Orlando at the time of the murder. Nevertheless, because Isidoro admitted some involvement in events after the crime (that he had disposed of jewelry discovered by his mother underneath her trailer) and because Luis was Isidoro’s brother, any impeachment of Isidoro also could have been helpful to the defense’s case.
 

 Rodriguez alleges ineffective assistance in his defense lawyer’s failure to impeach Isidoro, violations of
 
 Brady
 
 by the State’s failing to disclose potential impeachment evidence pertaining to Isidoro, and violations of
 
 Giglio
 
 by the State’s knowing presentation of false testimony. Rodriguez raises four distinct claims pertaining to Isidoro: (a) alleged secret dockets in Dade County involving Isidoro; (b) alleged involvement in drug activity and police investigations into such allegations; (c) alleged threats made by police to Isidoro; and (d) an alleged relationship between Isidoro and a member of the police department. We discuss each claim in turn and conclude that Rodriguez has not established a basis for relief under any of the claims asserted.
 

 Allegations of Secret Dockets
 

 Rodriguez first asserts that there may be secret dockets in Dade County involving Isidoro which should be disclosed. After thoroughly reviewing the evidence presented during the evidentiary hearing, the postconviction court denied relief on this claim as follows:
 

 There was absolutely no evidence presented that there is a secret docket that relates to Isidoro Rodriguez. Since Isi-doro was not arrested for anything but trespass in 1978, there can be
 
 no
 
 secret docket since there was no arrest. In fact, it is clear to this court that the Defendant confuses sealed plea agreements, which were the topic of the Miami Herald article, with a sealed docket.
 

 We agree.
 

 Rodriguez has not presented any evidence that a secret docket exists concerning Isidoro. Despite the fact that several witnesses testified that they were unable
 
 *291
 
 to find any hidden or secret dockets concerning Isidoro, Rodriguez alleges that secret dockets could still exist involving this witness. Rodriguez’s claim as to this issue is completely speculative and without any support. Accordingly, we deny this sub-claim.
 
 See Maharaj v. State,
 
 778 So.2d 944, 951 (Fla.2000) (“Postconviction relief cannot be based on speculation or possibility”).
 

 Allegations of Drug Activity
 

 Next, Rodriguez asserts that the State failed to disclose evidence that Isidoro was involved in significant drug-related offenses. In support, he points to evidence that shows Isidoro was investigated by Seminole County law enforcement officials for possible narcotics offenses.
 

 The postconviction . court denied this claim as follows:
 

 The deposition of Pete Kelting was introduced into evidence. Kelting stated that there was no indication that Isidoro ever worked as an informant or that he was ever arrested. There was an anonymous tip that drugs were being sold out of a residence where Isidoro lived. It was investigated and no arrests were made.
 

 The fact that Isidoro was investigated in Seminole County would not have been admissible as impeachment. Under § 90.610, Fla. Stat., only contact which results in a criminal conviction is admissible to prove bad character. Since Isi-doro was not arrested, he was not convicted. It’s possible Isidoro didn’t know he was investigated.
 

 As the postconviction court pointed out, Rodriguez fails to establish how testimony and information concerning the Seminole County investigation could be admissible at trial on the murder charges against Rodriguez or have led to any favorable evidence. Isidoro was never arrested or charged with- any criminal drug activity; police received only a tip involving possible narcotics violations at a residence in which Isidoro lived. Rodriguez presents no evidence that Isidoro was even aware that he was being investigated. Even assuming that Rodriguez could show the evidence was exculpatory or proper impeachment evidence, he clearly cannot show any prejudice — i.e., that this evidence “could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Smith,
 
 931 So.2d at 796 (quoting
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936).
 

 Alleged Threats by Police
 

 Rodriguez alleges that his trial counsel was ineffective in failing to impeach Isidoro regarding available evidence that Isidoro cooperated as a witness only after he was threatened by police. In denying this claim, the postconviction court observed that all witnesses called by Rodriguez stated the opposite — that Isidoro was never threatened or given special benefits.
 

 Rodriguez called numerous witnesses regarding this claim during the relinquishment evidentiary hearing. All of them denied that Isidoro had been threatened. Sergeant Singleton explicitly. stated that he did not threaten Isidoro or. tell him that he would be arrested and that he did not have any knowledge that Detective Ny-berg or Detective LeClaire threatened him either. Initially Isidoro was not being cooperative, so Sergeant Singleton brought Isidoro’s wife . to him, hoping that she would help convince her husband to cooperate. Hq did not recall any arrangement he made with Isidoro in exchange for Isi-doro’s cooperation. Detective LeClaire also testified, but had no independent knowledge of Isidoro.
 

 
 *292
 
 Finally, the prosecutor, Abraham Laeser, testified that he also did not know of any threats or promises that Isidoro received in exchange for his cooperation. The only information he could recall on the subject was from either a deposition or trial testimony that Isidoro felt he needed to cooperate, so the police would not arrest his mother.
 

 There is competent, substantial evidence that supports the trial court’s factual findings that no evidence was introduced to show that Isidoro was threatened, or promised favors in exchange for his cooperation. Accordingly, we deny this subclaim. Defense counsel cannot be considered ineffective for failing to impeach Isidoro on evidence that did not exist.
 

 Allegations Regarding Relationship with Miami-Dade Police Department
 

 In his final subclaim, Rodriguez alleges that the State failed to disclose that a business partner and family member of Isidoro (Lieutenant Villanueva) was a detective with the Miami-Dade Police Department. The postconviction court denied this claim, finding that no impeachment evidence existed because Lieutenant Villanueva did not know about Isidoro’s involvement in the case until after the fact, he did not have contact with the officers who investigated the case, and he was not involved with the investigation.
 

 The record supports these findings. Lieutenant Villanueva testified at the relinquishment hearing, acknowledging that he knew Isidoro because Isidoro had married his cousin and that he and Isidoro had previously bought two houses, which they sold for a profit. Lieutenant Villanueva explicitly denied that the officers who were investigating the case talked to him about the investigation and further testified that he was not involved “in any way, shape, or form in anything having to do with this investigation.” None of the witnesses testified about any involvement that Lieutenant Villanueva had in the case. Further, defense counsel acknowledged that he would not have brought this information before the jury if this was all the information he had uncovered because it Would have diminished his credibility.
 

 The postconviction court’s factual findings are supported by competent, substantial evidence. Moreover, the evidence is insufficient to support a
 
 Brady
 
 violation. Rodriguez has not demonstrated that the relationship between Isidoro and Lieutenant Villanueva was favorable evidence, and thus he cannot meet the first prong of
 
 Brady.
 
 Further, Rodriguez cannot establish prejudice because this type of attenuated impeachment evidence could not “reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Smith,
 
 931 So.2d at 796 (quoting
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936).
 

 In reviewing all of the subclaims regarding Isidoro, we find that Rodriguez has failed to show that the State suppressed any favorable evidence, that the State presented false testimony at trial, or that trial counsel was ineffective during the impeachment of Isidoro. Accordingly, we deny relief.
 

 C. Whether Counsel Was Ineffective in Failing to Present Evidence Implicating Isidoro in the Crime
 

 Rodriguez asserts his counsel was ineffective in failing to present testimony from Luis’s girlfriend that would have implicated Isidoro and failing to present evidence alleging that Isidoro or Luis’s family had sold the jewelry belonging to the crime victims.
 

 As to the first aspect of this claim, Rodriguez alleged that his counsel was ineffective for failing to present available evidence from Luis’s girlfriend (Cathy
 
 *293
 
 Sundin) that Luis and Isidoro drove together from Orlando to Miami to commit the crimes. Contrary to Rodriguez’s allegations regarding this claim, he failed to present any testimony to establish that such available evidence existed.
 

 At the trial, Luis testified that he flew to Miami in order to participate in the crime. Although Luis did testify at the evidentia-ry hearing, counsel did not inquire as to this matter. The only evidence upon which Rodriguez relies to support this claim is the pretrial deposition of Cathy Sundin, who was Luis’s girlfriend at the time of the crimes. The postconviction court refused to consider this pretrial deposition, holding that the deposition constituted hearsay. However, even if this deposition had been considered, it would not support a claim of ineffective assistance of counsel. Specifically, in her pretrial deposition, Sundin surmised that Isidoro drove Luis to Miami because Isidoro was “the only one around with a car.” She had no distinct memory of Isidoro picking up Luis. Further, she had no knowledge that Isidoro helped in committing the crime. However, Sundin mentioned on numerous occasions throughout her deposition that Rodriguez was the person who had planned the crime and that Luis believed he would obtain a significant amount of money if he helped Rodriguez. Because Rodriguez has failed to establish that favorable evidence existed as to this issue, we deny this subclaim.
 

 As to the second aspect of this subclaim, Rodriguez also asserts that his counsel should have presented available evidence that members of Isidoro’s or Luis’s family had and sold jewelry belonging to the victims. Although Rodriguez was permitted an evidentiary hearing on this claim, no evidence was presented that any specific person kept or sold the jewelry. Rodriguez has failed to demonstrate any available evidence that his trial counsel failed to present. Accordingly, we hold that the trial court correctly denied this claim.
 

 D. Whether Counsel Was Ineffective Relating to the Testimony of Edgar Baez
 

 In the next claim we address, Rodriguez asserts that his counsel was ineffective during the guilt phase because he failed to present the testimony of Edgar Baez, a witness who saw a man taking a woman into the Josephs’ apartment around the time of the murders. Rodriguez asserts that Baez’s testimony could demonstrate that the person Baez saw at the time of the crime did not match Luis or Rodriguez but could have been Isidoro. Specifically, Baez was across the street on the day of the murder and saw a man let an older woman (presumably Abraham) into the apartment. Baez had described the man he saw very briefly in a 1984 sworn statement, and a composite sketch was prepared. Baez remembered that a sketch was made but did not recall if he was shown the final picture. Nor could Baez attest that the sketch he helped make, and which he was shown at the hearing, resembled the person he saw in 1984. In reviewing the entire record as it relates to this claim, we affirm the trial court’s denial of relief because, based on the evidence presented, Rodriguez is unable to establish either deficiency or prejudice in failing to present Baez as a witness.
 

 E. Potential Impeachment Concerning Alejandro Lago
 

 We next address Rodriguez’s allegations that the State violated
 
 Brady
 
 because trial counsel was never provided with letters that contained information that could have been used to attack the
 
 *294
 
 credibility of Alejandro Lago.
 
 [12]
 
 According to Rodriguez, the State possessed letters showing that Lago received consideration in exchange for his assistance and that the results of a polygraph test that he took were considered suspect
 
 [13]
 
 and that if the jury had been made aware of this information, the jury might have rejected the statements of Lago that were presented through the testimony of a law enforcement officer.
 

 Specifically, Lago was an inmate who shared a cell with Rodriguez during their confinement. Lago told Detective Crawford that Rodriguez admitted he was not crazy but knew that he had to act insane or the police would connect him to other crimes. The prosecutor initially considered calling Lago to be a penalty phase witness, but instead called Detective Crawford to testify as to Lago’s statements. On direct appeal, this Court held that permitting Detective Crawford to testify to the double hearsay statements from Lago was error, but determined that the admission of the testimony was harmless.
 
 Rodriguez,
 
 753 So.2d at 44-45.
 

 During postconviction proceedings, the circuit court rejected this claim, first questioning whether this information could have impeached Lago because he was never called to testify. Moreover, even if impeachment was possible, the court found that the claim lacked merit because, on direct appeal, any error regarding Lago was found to be harmless. Further, the circuit court thoroughly reviewed the original sentencing order, noting that the original trial judge provided an in-depth analysis as to whether Rodriguez was mentally ill and concluded that Rodriguez consciously exaggerated his symptoms and manipulated the doctors after he learned that he could avoid going to prison for his criminal behavior if he was mentally ill. The post-conviction court concluded that based on the testimony of the mental health experts and Rodriguez’s prior seventy-one felony convictions, the judge and jury could have easily concluded death was the appropriate sentence.
 

 We affirm the trial court’s conclusion. As addressed above, in order to prevail on a
 
 Brady
 
 claim, Rodriguez must show: “(1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the . State, and (8) because the evidence was material, the defendant was prejudiced.”
 
 Riechmann,
 
 966 So.2d at 307. Here, there are substantial questions as to whether Lago had been promised any benefits for his assistance before the trial and whether the polygraph would have led to any favorable evidence. Even if Rodriguez could meet the first prong of
 
 Brady,
 
 however, he cannot show prejudice. On direct appeal, this Court held the trial court erred in permitting Lago’s statements to be admitted through Detective Crawford. However, the Court explicitly determined that “the admission of the testimony was harmless beyond a reasonable doubt given the number of
 
 *295
 
 strong aggravators in this case and the conflicting testimony as to Manuel Rodriguez’s mental health, including some testimony that he was a malingerer.”
 
 Rodriguez,
 
 753 So.2d at 45. Turning to the
 
 Brady
 
 claim, the challenged documents would only have presented potential additional bases to impeach Lago’s statements, assuming they were admissible at all. This additional evidence would not change our harmless error analysis as set forth on direct appeal. Accordingly, we affirm the postconviction court’s ruling on this claim.
 

 Petition for Writ of Habeas Corpus
 

 Rodriguez raises nine claims in his petition for habeas corpus: (1) appellate counsel was ineffective in failing to appeal rulings relating to limits, on the presentation of family history of mental illness as mitigation; (2) counsel was ineffective in failing to appeal the trial court’s improper consideration of Rodriguez’s mother’s mental illness as mitigation; (3) counsel was ineffective in failing to appeal the denial of relief based on improper prosecutorial comments relating to mitigation; (4) counsel was ineffective hi failing to appeal the denial of relief on prosecuto-rial argument regarding Rodriguez’s prior convictions; (5) counsel was ineffective in failing to appeal the denial of a motion to suppress Rodriguez’s statements; (6) counsel was ineffective in failing to appeal pervasive prosecutorial misconduct and comment; (7) counsel was ineffective in faffing to appeal numerous rulings limiting cross-examination; (8) counsel was ineffective in failing to appeal the ruling allowing the State to bring witness Maria Malakoff to the stand solely to impeach her with her prior inconsistent statement; and (9) this Court conducted an improper harmless error analysis in the direct appeal.
 

 Rodriguez’s petition for writ of habeas corpus is “the proper vehicle to advance claims of ineffective assistance of appellate counsel” and the criteria for analyzing the claims “parallel the
 
 Strickland
 
 standard for ineffective trial counsel.”
 
 Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000) (footnote omitted) (quoting
 
 Wilson v. Wainwright,
 
 474 So.2d 1162, 1163 (Fla.1985)). Therefore, Rodriguez must first establish that his appellate counsel’s performance was deficient because of errors that are of such magnitude and are so serious that they fall outside the range of professionally acceptable performance.
 
 Id.
 
 Second, Rodriguez must establish that he was prejudiced because of the deficiency. In determining if prejudice is shown, it must appear that appellate counsel’s deficient performance “compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.”
 
 Id.
 
 (quoting
 
 Thompson v. State,
 
 759 So.2d 650, 660 (Fla.2000)).
 

 None of the first eight claims warrant relief because the underlying claims of error would have been rejected on direct appeal, and therefore Rodriguez cannot establish either deficiency or prejudice. As to the last claim, that this Court performed an improper harmless error ánalysis on direct appeal, this claim is an improper attempt to relitigate a claim we have already rejected.
 
 See, e.g., Taylor v. State,
 
 3 So.3d 986, 1000 (Fla.2009) (holding that a petitioner “cannot relitigate the merits of an issue through a habeas petition or use an ineffective assistance claim to argue the merits of claims that either were or should have been raised below”).
 

 CONCLUSION
 

 We affirm the trial court’s denial of relief on the motion for postconviction relief. We deny Rodriguez’s petition for a writ of habeas corpus.
 

 It is so ordered.
 

 
 *296
 
 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.
 

 POLSTON, J., concurs in result only.
 

 [1]
 

 . Luis Rodriguez and Manuel Rodriguez were not related. Luis Rodriguez was the brother of Maria Malakoff, Manuel Rodriguez’s girlfriend.
 

 [2]
 

 . Luis’s trial testimony was "somewhat differ
 
 *281
 
 ent than his initial confession” regarding the exact circumstances of the murders.
 
 Rodriguez,
 
 753 So.2d at 34. “In his initial confession, Luis Rodriguez stated that he shot Abraham through a pillow; that he shot at two people; that he had ingested cocaine and marijuana before the homicides; and that Manuel Rodriguez shot the Josephs after he shot Abraham.”
 
 Id.
 
 at 34 n. 1.
 

 [3]
 

 . On appeal, this Court concluded that the trial court erroneously considered two aggra-vators separately (committed during a burgla,ry and committed for pecuniary gain), but found the error to be harmless beyond a reasonable doubt.
 
 Rodriguez,
 
 753 So.2d at 46.
 

 [4]
 

 . Rodriguez’s amended motion will be governed by the requirements applicable to rule 3.850 because the original motion was filed before the effective date of Florida Rule of Criminal Procedure 3.851 on October 1, 2001.
 

 [5]
 

 . Rodriguez raised the following claims: (1) his convictions are materially unreliable based on the cumulative effects of ineffective assistance of counsel, the State withholding exculpatory or impeaching evidence, and the existence of .newly discovered evidence; (2) his trial counsel had a conflict of interest; (3) Rodriguez was denied effective representation of trial counsel; (4) Rodriguez was denied the right to a fair trial based on prejudicial pretrial publicity and failing to change the venue; (5) Rodriguez is innocent of first-degree murder; (6) Rodriguez was denied effective assistance of counsel and the State withheld material impeachment evidence during the penalty phase and sentencing; (7) Rodriguez was denied his rights under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (8) Rodriguez is innocent of the death penalty; (9) Rodriguez’s right of confrontation was violated during the penalty and sentencing phases; (10) Rodriguez’s constitutional rights were violated when he was absent from critical stages of the trial; (11) Rodriguez’s convictions and sentences are unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (12) Rodriguez was denied a fair trial and a fair, reliable, and individualized capital sentencing determination; (13) Rodriguez’s death sentence is premised on fundamental error because the jury was provided with inadequate instructions concerning what constitutes certain aggravating circumstances; (14) Rodriguez is being denied his constitutional rights based on rules that prohibit his counsel from interviewing jurors; (15) Rodriguez was denied his constitutional right to a fair trial, his right to counsel, and his right to confront the witnesses because he was rendered incompetent due to medication and his mental condition; (16) the verdict of guilt and jury recommendation for death are unreliable because the trial court provided the jury with erroneous statements regarding the applicable standard by which to judge expert testimony; (17) Rodriguez's sentence of death is being exacted pursuant to a pattern and practice of discrimination on the basis of race; (18) Florida's capital sentencing statute is unconstitutional on its face and as applied; (19) execution by electrocution or lethal injection is cruel and unusual punishment; (20) Rodriguez is being denied his constitutional rights because access to certain records and files are being withheld in violation of chapter 119,
 
 *283
 
 Florida Statutes (2009); (21) Rodriguez is not competent to be executed; and (22) Rodriguez’s trial was fraught with procedural and substantive errors that cannot be considered harmless when viewed as a whole.
 

 [6]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [7]
 

 . Rodriguez raised the following claims: (1) he is entitled to a new trial due to the deprivation of the effective assistance of counsel and the violation of his due process rights under
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the lack of a full and fair postconviction hearing before a neutral tribunal served to deny Rodriguez his constitutional right to due process; (3) Rodriguez was denied his Sixth Amendment right to a fair and impartial jury and the effective assistance of counsel during voir dire; (4) Rodriguez is entitled to a hearing in order to establish that his trial counsel operated under multiple conflicts of interest; (5) Rodriguez was denied a reliable sentencing phase and is entitled to’ a hearing on each of his penalty phase claims; and (6) the lower court erred in summarily denying the remainder of Rodriguez’s claims.
 

 [8]
 

 .After fully, reviewing all of his claims and subclaims, we deny the following claims, which the trial court summarily denied, without further discussion because they are conclusively refuted by the record or are without merit: the circuit court erred in denying a hearing on the claims that counsel was ineffective in litigating the suppression of Rodriguez’s statements and ineffective in failing to object to the prosecutor’s comment on Rodriguez’s right to remain silent (a subclaim of claim 1); the circuit court failed to consider the cumulative effects of the individual errors that occurred (a subclaim of claim 1); Rodriguez was denied his due process right to an accurate transcript of the evidentiary proceedings (a subclaim of claim 2); trial counsel failed to preserve the record regarding the refusal to allow Rodriguez to make a peremptory challenge (a subclaim of claim 3); trial counsel was ineffective in failing to protect Rodriguez’s right to a fair and impartial jury (a subclaim of claim 3);, Rodriguez is entitled to a hearing to establish that his trial counsel operated under multiple conflicts of interest (Claim 4); Rodriguez was denied a reliable sentencing phase and is entitled to a hearing on each of his penalty phase claims (Claim 5) (as addressed above, he did receive a hearing pertaining to a subclaim relating to Lago); and the circuit court erred in summarily denying the remainder of Rodriguez’s claims (Claim 6).
 

 [9]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [10]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [11]
 

 . To the extent that Rodriguez asserts that his trial counsel rendered ineffective assistance by failing to properly impeach Luis, we conclude this claim is meritless and further deny the claim that Rodriguez was denied a full and fair hearing on his ineffective assistance of counsel claim.
 

 [12]
 

 . Although Lago never testified at the trial, his testimony was admitted through Detective Crawford during the penalty phase. As addressed below, this Court held this constituted error, but was harmless.
 
 Rodriguez,
 
 753 So.2d at 44-45.
 

 [13]
 

 . As this Court has recognized, although "polygraph evidence is generally inadmissible, ... the issue we focus on for purposes of determining a
 
 Brady
 
 violation is whether the evidence would lead to admissible substantive or impeachment evidence.”
 
 Duest v. State,
 
 12 So.3d 734, 746 (Fla.2009) (discussing that in
 
 Rivera v. State,
 
 995 So.2d 191 (Fla.2008), this Court held that a trial court erred in summarily denying the defendant’s
 
 Brady
 
 claim, which was based in part on the State’s failure to disclose that a State witness had lied in polygraph examinations in other cases).