PER CURIAM.
Harry Lee Butler was convicted of first-degree murder and sentenced to death for the March 1997 murder of his former girl- *644 Mend, Leslie Fleming. This Court affirmed Butler’s conviction and death sentence on direct appeal. See Butler v. State, 842 So.2d 817 (Fla.2003). On July 13, 2004, Butler filed a motion to vacate his conviction and death sentence pursuant to Florida Rule of Criminal Procedure 3.851 in the Sixth Judicial Circuit in and for Pinellas County. Butler filed an amended rule 3.851 motion on February 4, 2005. The postconviction court held three evi-dentiary hearings on the motion, the first in May 2008, the second in November 2008, and the third in September 2009. On May 13, 2010, the postconviction court entered an order denying relief.
Butler now appeals the denial of his rule 3.851 motion and also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. Having considered the briefs filed by the parties and having heard oral argument, we affirm the postconviction court’s denial of relief and deny Butler’s petition for writ of habeas corpus.
I. STATEMENT OF THE CASE AND FACTS
We described the facts of this case when Butler’s conviction and death sentence were reviewed on direct appeal:
On the night of March 13, 1997, or early morning hours of March 14, 1997, Leslie Fleming (Fleming), also known as Bay, was stabbed multiple times and asphyxiated by her former boyfriend, Harry Butler (Butler). Shawna Fleming (Shawna), Leslie’s sister, discovered Fleming’s body at about 7:15 a.m. on the morning of March 14 when LaShara Butler (LaShara), the couple’s six-year old daughter, opened the apartment door for Shawna. According to LaSh-ara’s trial testimony, on the night before the body was discovered, she had been sleeping with her mother when her father entered the bedroom, picked her up, and took her to her own room. LaShara testified that she saw his face during this process. LaShara also stated she heard her mother say, “Stop,” saw her father’s leg pinning down her mother’s leg, and heard her mother screaming as though she were being hurt. Officer Scott Ballard, one of the first officers on the scene, testified that on the way to the police station, LaSh-ara said, “My daddy hurt mommy. I heard him yelling at her.”
Lola Young, a long-time neighbor of Fleming’s who had also known Butler for some time, testified she saw Butler hiding in the bushes near Fleming’s apartment between 3:30 and 4 a.m., around the same time as the murder. She also stated that soon after seeing Butler, she saw a blue car speed through the housing complex, stop abruptly, pick up Butler, and speed off. Latwanda Allen (Allen) testified that she, Butler and Martisha Kelly (Kelly) are cousins. Allen said Kelly told her Butler killed Fleming. At trial, Kelly denied having made the statement.
[[Image here]]
Detective Green testified Kelly told him the murder weapon could be found in a dumpster near a food store where a pair of blue shorts, a white T-shirt, a pair of underwear, a towel, and a pair of tennis shoes having no laces were eventually found. However, no weapon was recovered from this location. Dr. Jeannie Eberhardt, a forensic scientist specializing in DNA serology, testified she found the presence of blood on the white T-shirt, but she was unable to confirm a DNA profile of the blood. Blood stains found on the denim shorts, towel, and boxer shorts were also tested, with the same result. The blood was either of an inadequate amount or degraded. The *645 dyes of the denim shorts inhibited DNA testing. However, testing of the sneakers revealed a DNA profile consistent with that of the victim.
Butler, 842 So.2d at 821.
At trial, Butler admitted that the sneakers were his, but he maintained that another man, Dennis Tennell, had borrowed them prior to Fleming’s murder. Other testimony established that Butler moved out of the apartment he shared with Fleming on March 9, 1997, several days before the murder. Lakisha Miller (nicknamed “Red”), Butler’s cousin and Fleming’s best friend, testified that Butler was upset because of the breakup and because Fleming was having an affair with another man, Adonis Hartsfield. Terry Jackson, Butler’s coworker, testified that the day before the murder, Butler said he was going to “kill Bay and Red.” At the end of the guilt phase, the jury found Butler guilty of first-degree murder. See id. at 821-22.
At the penalty phase, the State relied on the evidence presented during the guilt phase, while the defense presented two witnesses: Butler’s father, Junior Butler, and Butler’s sister, Sandra Butler. The jury recommended that Butler be sentenced to death by a vote of eleven to one. The trial court conducted a Spencer[1] hearing at which the defense presented the testimony of a psychiatrist, Dr. Michael Maher. The trial court later issued a sentencing order in which it concurred with the jury recommendation and sentenced Butler to death. The court found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel (HAC), no statutory mitigating circumstances, and four nonstatutory mitigating circumstances. See Butler, 842 So.2d at 822-23.[2]
Butler raised six claims of error on direct appeal. This Court rejected each claim and affirmed the conviction and death sentence. First, we held that the trial court did not err in admitting evidence concerning prior acts of violence committed by Butler. Id. at 823-27. Second, we held that the trial court properly allowed Dr. Eberhardt, the State’s DNA expert, to testify at trial. Id. at 827-29. Third, we rejected Butler’s claim that the trial court should have granted his motion for a new trial because of the State’s alleged failure to disclose a probation violation report concerning witness Lola Young. Id. at 829-30. Fourth, we held that Butler’s challenge to the jury instruction on the HAC aggravator was unpre-served and without merit. Id. at 830-31. Fifth, we held that the trial court did not fail to consider mitigating evidence of Butler’s impaired mental capacity. Id. at 831-32. Finally, we held that Butler’s death sentence was proportionate. Id. at 832-34. On rehearing, Butler argued that Florida’s capital sentencing scheme violates the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We held that Florida’s death penalty does not violate Ring. Butler, 842 So.2d at 834.
Butler raised eleven issues in his amended rule 3.851 motion. Butler’s first claim concerned the State’s failure to release evidence relating to postconviction DNA testing. Butler argued in his second through tenth claims that his trial counsel rendered ineffective assistance under *646 Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[3] In his final claim, Butler argued that the cumulative effect of all alleged errors sufficiently prejudiced him as to merit relief. Three evidentiary hearings were held on Butler’s amended motion. Two of Butler’s trial attorneys, Richard Watts and Anne Borghetti, testified at the hearings.[4] On May 8 and 9, 2008, the postconviction court heard testimony regarding the development and presentation of evidence during the guilt phase of Butler’s trial. On November 6 and 7, 2008, witnesses testified regarding Butler’s claim that counsel was deficient during the penalty phase. Finally, on September 29, 2009, Butler presented as a witness Professor David Dow of the University of Houston Law Center, who testified as an expert in norms and standards governing attorney conduct in death penalty litigation.
The postconviction court entered an order on May 13, 2010, denying Butler’s amended motion. As to Butler’s first claim, concerning the State’s failure to furnish him with certain public records relating to DNA testing, the court denied the claim as moot, citing an acknowledgement by Butler’s counsel that the issue had been resolved. As to Butler’s claims of ineffee-five assistance of counsel, the court denied each claim due to Butler’s failure to establish deficiency or prejudice or both under the standards set out in Strickland and its progeny. Lastly, the court held that because it found each of Butler’s individual claims to be without merit, cumulative error analysis was not appropriate.
Butler now appeals the postconviction court’s denial of relief. He argues that the postconviction court erred in denying relief based on each of his nine claims of ineffective assistance of counsel, and further asserts cumulative error as a basis for relief before this Court. In addition, Butler has filed an accompanying petition for writ of habeas corpus, in which he raises the following claims: (1) appellate counsel provided ineffective assistance by failing to file a petition for certiorari with the United States Supreme Court; (2) appellate counsel provided ineffective assistance by abandoning the claim that LaShara Butler was incompetent to testify at trial; (3) Florida’s lethal injection protocol constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution; and (4) Butler’s right against cruel and unusual punishment will be violated be *647 cause he may be incompetent at the time of execution. We address each of these claims below.
II. RULE 3.851 MOTION
A. Ineffective Assistance of Guilt Phase Counsel
In claims I through VIII in his Initial Brief, Butler argues that the post-conviction court erred in denying his claims that trial counsel rendered ineffective assistance during the guilt phase of his trial. Claims of ineffective assistance of counsel are governed by the decision of the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny. As the Supreme Court explained in Strickland, the right to counsel guaranteed by the Sixth Amendment of the United States Constitution “is the right to the effective assistance of counsel.” Id. at 686, 104 S.Ct. 2052 (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). For a claim of ineffectiveness of counsel to be considered meritorious, two requirements must be satisfied, commonly identified as “deficiency” and “prejudice.”
“First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards.” Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). In order to meet this first prong of the Strickland test, “the defendant must prove that counsel’s performance was unreasonable under ‘prevailing professional norms.’” Floyd v. State, 18 So.3d 432, 443 (Fla.2009) (quoting Morris v. State, 931 So.2d 821, 828 (Fla.2006)).
“Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.” Maxwell, 490 So.2d at 932. To establish prejudice, the defendant must show that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
For the second prong, “Strickland places the burden on the defendant, not the State, to show a ‘reasonable probability’ that the result would have been different.” Wong v. Belmontes [558 U.S. 15], 130 S.Ct. 383, 390-91, 175 L.Ed.2d 328 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Strickland does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum [558 U.S. 30], 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (alteration in original) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052).
Everett v. State, 54 So.3d 464, 472 (Fla.2010).
“Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo.” Hitchcock v. State, 991 So.2d 337, 346 (Fla.2008) (citing Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004)). With these standards in mind, we turn to Butler’s claims of ineffectiveness of guilt phase counsel.
*648 1. DNA Evidence
In his first claim, Butler challenges his trial attorneys’ development and presentation of DNA evidence. Butler’s argument relies on the postconviction testimony of Dr. Elizabeth Johnson. At trial, the State presented testimony by Dr. Jeannie Eber-hardt, a serologist with the Florida Department of Law Enforcement (FDLE), who conducted pretrial testing on DNA samples collected in the investigation of Fleming’s death. On cross-examination, the defense questioned Dr. Eberhardt regarding two reports she authored concerning a pair of sneakers identified as belonging to Butler. In the first report, dated August 18, 1997, Dr. Eberhardt reported on testing conducted on a blood DNA sample taken from the outside of the left sneaker. Dr. Eberhardt determined that the sample was consistent with the DNA of Leslie Fleming. In the second report, dated September 3, 1997, Dr. Eberhardt reported on testing that was conducted on five DNA samples taken from inside the left sneaker. She testified that three of the samples resulted in no reaction, while the results of testing on two of the samples, labeled 56A-4 and 56A-5, were inconclusive.
During postconviction proceedings, Dr. Johnson testified that despite the finding contained in Dr. Eberhardt’s report, the samples inside the left shoe contained sufficient information to determine that the donor was male and to eliminate Butler as a source of the DNA. Dr. Johnson explained that this information could not have been discovered by reading Dr. Eber-hardt’s report, which merely labeled the results as “inconclusive,” but could have been found by reviewing the raw data contained in Dr. Eberhardt’s bench notes. Butler argues that this information would have supported his argument that another individual committed the murder, specifically by providing evidence that an unidentified male was wearing the shoes at the time of the murder. He contends that his trial counsel rendered ineffective assistance by failing to adequately consult with a DNA expert and for failing to obtain Dr. Eberhardt’s bench notes in discovery. Below, the postconviction court denied relief on these claims. We affirm, finding neither deficiency nor prejudice in counsel’s handling or presentation of this evidence.
As to the deficiency prong, Butler’s claims that counsel was deficient for failing to adequately consult with a DNA expert and for failing to obtain Dr. Eberhardt’s bench notes are not supported by the record. Richard Watts, one of Butler’s trial attorneys, testified that the defense retained and consulted with DNA expert Dr. Gary Litman. Watts testified that the defense obtained DNA laboratory reports from FDLE and provided them to Dr. Litman. Watts stated that the defense would have relied on Dr. Litman to tell them whether they needed to take additional action, such as obtaining Dr. Eber-hardt’s bench notes. Butler’s deficiency claim is further undermined by the testimony of Dr. Johnson, who stated that a layman reading Dr. Eberhardt’s report would not have been able to determine that the defendant was excluded as a source of the DNA sample taken from inside the left sneaker; only an expert reviewing Dr. Eberhardt’s notes and worksheets could have uncovered that fact. As the postconviction court concluded below, “Because the record is devoid of any evidence suggesting that counsel failed to diligently investigate the DNA results or otherwise acted deficiently, they cannot be said to have provided ineffective assistance of counsel in this regard.”
Nor do we find that Butler was prejudiced by the absence of the DNA evidence. At the postconviction evidentia- *649 ry hearing, Dr. Johnson testified that there was no way to tell when or how the unidentified DNA was transferred to the shoe. She noted that the DNA could have been deposited through sweat or could have been transferred to the shoe from something in the dumpster where the shoes were found. The importance of this testimony is highlighted by the trial testimony of Detective Wilton Lee, Jr., who discovered the shoes in a convenience store dumpster not far from the crime scene. Detective Lee stated that the shoes were located one half to three quarters of the way down inside the dumpster among bags of trash, rotten food, flies, and maggots, and that the shoes and clothing were wet from rain. Since it could not be established whether the DNA was deposited before, during, or after the murder, this evidence would not have provided any significant support to the defense’s argument that an unidentified third person committed the murder while wearing Butler’s shoes.
2. LaShara Butler
Butler’s next Strickland claim is directed toward the trial testimony of then seven-year-old LaShara Butler, daughter of defendant Harry Butler and victim Leslie Fleming. At trial, LaShara testified that she was sleeping in her mother’s room on the night of the murder when her father entered the bedroom, picked her up, and took her to her own room. Butler, 842 So.2d at 821. During postconviction proceedings, Butler presented psychologist Dr. Janice Stevenson, who testified that during pretrial proceedings, the psychologist who evaluated LaShara, Dr. Joseph Crum, did not perform a sufficient evaluation to determine whether LaShara was competent to testify. Dr. Stevenson noted the existence of tests which could have been used to determine whether LaShara was suffering from psychological trauma, which Dr. Crum failed to perform. Dr. Stevenson stated that at the time of Butler’s trial, it was not uncommon for defense attorneys to retain mental health experts to evaluate the competency of child witnesses and the credibility of their testimony.
Here, Butler argues that his trial counsel was deficient for failing to retain an expert in child psychology and for failing to challenge LaShara’s competency and credibility before the trial court and the jury. In addition, Butler argues that counsel was deficient for failing to object to testimony by LaShara in which she indicated that her father had been to jail. The postconviction court rejected both claims based on its determination that Butler failed to establish prejudice under Strickland with regard to either claim. We agree.
a. Failure to Consult Expert in Child Psychology
Before trial, LaShara was evaluated by Dr. Crum at the request of the State Attorney’s Office. Dr. Crum was deposed by the Public Defender, who was then representing Butler, on August, 22, 1997. In his deposition, Dr. Crum stated that he interviewed LaShara twice. The first interview took place on March 24, 1997, ten days after her mother’s death, and the second interview took place on April 2, 1997. Each interview lasted approximately forty-five minutes. The purpose of the interviews was to assess LaShara’s competency and to explore whether she was capable of testifying at trial. Dr. Crum stated that he was not asked to assess LaShara’s credibility. He conducted an IQ test and found that LaShara’s cognitive abilities fell within an average to high average range. He determined that her ability to understand the difference between telling the truth and telling a lie was accurate for her age, and found no *650 evidence of serious emotional difficulties that would impede her ability to testify. Dr. Crum stated that he reviewed a videotape of LaShara’s questioning by police and said that he asked LaShara briefly whether she remembered what happened to her mother, but also said that he did not inquire into the details of her memory.
LaShara was deposed by defense attorney Michael Schwartzberg on April 7, 1998. On June 24, 1998, the defense filed a motion to determine LaShara’s competency to testify. A competency hearing was held shortly before trial. Before the hearing, the court agreed, at the request of defense counsel, to review a videotape of the interview law enforcement officers conducted with LaShara shortly after her mother’s murder. At the competency hearing, the trial court questioned LaSh-ara. The court first asked LaShara general questions concerning where she lived, where she attended school, who her friends were, and whether she could remember things that happened when she was six years old. The court then questioned LaShara concerning whether she knew the difference between the truth and a lie, whether she understood when something is make-believe, whether she knew the consequences of telling a lie, and whether she was able to take an oath and make a promise to tell the truth.
LaShara was also questioned by both the State and the defense. On direct examination by attorney Schwartzberg, LaShara admitted that her grandmother had repeatedly told her that her father killed her mother and had instructed her to tell the court that her father killed her mother. Based on LaShara’s testimony, defense counsel argued that LaShara’s testimony was tainted by the continuous suggestions from her grandmother. Counsel also discussed the interview police officers conducted with LaShara shortly after her mother’s death. Counsel argued that the officers were aware that Harry Butler was the primary suspect, that LaShara’s statement that her father killed her mother was the result of suggestions by the officers, and that any statement made by LaShara after the interview would be tainted. The court agreed with the defense that the officers exhibited bias in the videotaped interview. Nonetheless, the court ruled that LaShara would be permitted to testify, explaining:
The long of the short of it is I don’t see anything that’s going to taint her testimony as a matter of law where it should be excluded from the jury. I will indicate to you that everything I have heard, everything I saw on that tape may go — will probably go into evidence if you all choose so that the jury can give it all proper weight. But this child is bright, articulate, well able to express the things she has observed back then and now, and she is going to be on her own when you start asking her questions about what was said, what was discussed, what was asked, whether that suggested something.
At trial, LaShara was first questioned by the State and was then cross-examined by Schwartzberg. LaShara admitted during cross-examination that she had a conversation with a policeman on the day following her mother’s murder. She also agreed that her grandmother had told her “a lot” that her father killed her mother. She agreed that her grandmother becomes angry when she talks about LaShara’s father; LaShara further admitted that when her grandmother gets angry, she also becomes angry. Defense counsel also read from a deposition transcript LaShara’s previous statements which conflicted in certain respects with statements she made at trial. Schwartzberg later discussed weaknesses in LaShara’s testimony when *651 delivering the defense’s closing argument, in which he argued to the jury that LaSh-ara’s testimony was unreliable and was the result of pressure from the police and from her grandmother to identify her father as the killer.
Here, Butler argues that trial counsel was deficient for failing to have LaShara evaluated by an expert in child psychology. He argues that if counsel had presented such an expert at the pretrial competency hearing, the trial court would have found LaShara incompetent to testify. Butler further argues that even if the trial judge had found LaShara competent, an expert could have done more to call LaShara’s reliability into question at trial, leading the jury to disregard her testimony and acquit Butler.
First, we find that Butler has not established that counsel was deficient. As discussed above, in order to satisfy the deficiency prong of Strickland, “the defendant must prove that counsel’s performance was unreasonable under ‘prevailing professional norms.’” Floyd, 18 So.3d at 443 (quoting Morris, 931 So.2d at 828). The only evidence supporting Butler’s claim of deficiency is the testimony of Dr. Stevenson, who said that at the time of Butler’s trial it was not uncommon for defense attorneys to employ experts in child competency to evaluate child witnesses. However, Butler has not presented evidence that the failure to do so fell outside “prevailing professional norms,” id., particularly in light of the efforts that were in fact made by Butler’s counsel to exclude and discredit LaShara’s testimony.
Second, Butler has not established a reasonable probability that the result of the proceeding would have been different had such an expert been presented. See Everett, 54 So.3d at 472. With regard to the trial court’s decision to admit LaSh-ara’s testimony, this Court has explained:
In Florida, whether a child witness is competent to testify is based on “his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth.” Lloyd v. State, 524 So.2d 396, 400 (Fla.1988); see Bell v. State, 93 So.2d 575, 577 (Fla.1957). Accordingly, when evaluating the competency of a child, the trial court should consider the following:
(1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth.
Griffin v. State, 526 So.2d 752, 753 (Fla. 1st DCA 1988) (citing Lloyd, 524 So.2d at 400); see also Baker v. State, 674 So.2d 199, 200 (Fla. 4th DCA 1996). The trial judge has the discretion to decide whether a witness of tender age is competent to testify and, accordingly, the decision to allow a child to testify is reviewed for abuse of discretion. See Lloyd, 524 So.2d at 400.
Floyd, 18 So.3d at 443-44.
In the instant case, the trial court ruled that LaShara was competent to testify after a hearing in which LaShara was questioned by the court, the State, and the defense. During the postconviction evi-dentiary hearing, Dr. Stevenson expressed the opinion that LaShara was not properly evaluated to determine whether she was suffering from trauma, which may have affected her ability to recall the events surrounding her mother’s death. Dr. Stevenson also explained that a child in LaSh-ara’s position would have been highly suggestible. However, many of these issues were in fact raised by the defense at the pretrial competency hearing. The trial *652 court agreed that LaShara’s testimony may have been affected by the bias of the adults around her, but found that these issues went toward the credibility of her testimony, not toward whether she was competent to testify as a matter of law. Whether LaShara’s testimony was tainted by the bias of the police interviewer or her grandmother was also raised by the defense both during cross examination and during closing argument. Thus, while an expert witness may have provided additional support to the defense’s arguments, the trial court and the jury were already made aware of the issues raised by Dr. Stevenson. Butler has not shown a reasonable probability that the result of the proceedings would have been different had such an expert been presented.
b. Failure to Object
Additionally, Butler argues that counsel rendered deficient performance in faffing to object to a statement made by LaShara in the course of her trial testimony. On direct examination, the prosecutor questioned LaShara regarding the house she lived in with her mother. LaShara was asked how many other children lived with them. She responded that her two younger sisters also lived there. She then stated: “When my daddy got out of jail one time, my other sisters and my one brother they came and then they left.” The State did not comment on or inquire further into LaShara’s reference to her father’s time in jail, but continued its questioning by asking where LaShara, her mother and her sisters slept when they lived in the house.
Butler argues here that defense counsel should have objected to LaShara’s statement, which he claims prejudiced his case by alerting the jury that he had previously been incarcerated. We find that Butler was not prejudiced, however, because the jury was already aware of at least some of Butler’s criminal history. For example, attorney Watts informed the jury in the defense’s opening statement that Butler was a cocaine dealer and that he had previously been to jail for domestic battery. Additionally, Butler himself testified that he had several prior felony convictions and had been to prison. In light of this testimony, trial counsel’s failure to object to LaShara’s statement does not does not undermine confidence in the result of Butler’s trial. See Floyd, 18 So.3d at 443.
3. Terry Jackson
Third, Butler argues that trial counsel was deficient for faffing to sufficiently investigate and cross-examine witness Terry Jackson. At trial, Jackson testified that he gave Butler a ride in his car the day before the murder, and that while they were driving Butler said he was going to “kill Bay and Red,” i.e., Leslie Fleming and Lakisha Miller. See Butler, 842 So.2d at 822. Butler alleges that evidence existed at the time of trial indicating that there were criminal charges pending against Jackson when Fleming’s murder was being investigated and that Jackson’s testimony was procured in exchange for favorable treatment. Butler argues that had counsel conducted a sufficient investigation, counsel would have uncovered this evidence, which would have discredited Jackson’s testimony. Butler also contends that counsel should have cross-examined Jackson concerning inconsistencies between his testimony at trial and his initial police statement. We agree with the postconviction court’s finding that these claims are without merit.
At the postconvietion evidentiary hearing, attorney Watts testified that he was unaware of any pending charges against Jackson and that he was not familiar with any deal Jackson might have received in exchange for his testimony. The trial rec *653 ord shows that during pretrial proceedings, attorney Schwartzberg discussed Jackson’s statement to law enforcement with the trial court and sought to have Jackson’s statements excluded as irrelevant and unduly prejudicial. The trial court denied the motion. At trial, Schwartzberg cross-examined Jackson. Jackson clarified his direct examination testimony, stating that Butler made the statement concerning Fleming and Miller while they were in Jackson’s car, after Jackson agreed to drive Butler to the bank. On redirect examination, the prosecutor asked Jackson whether he made a statement to the police after Fleming’s murder. Jackson replied that he was questioned by law enforcement after being arrested on a misdemeanor warrant. Jackson was not questioned by either party concerning the details of his arrest or whether he was charged with any offenses.
Below, Butler submitted several documents relating to Jackson’s criminal history to the postconviction court in support of his rule 3.851 motion to vacate his conviction and sentence. One of the documents is a report by Detective Marvin Green concerning his investigation of several burglaries reported by victim Laticia Tucker. In the report, Detective Green described how he and several other officers encountered Jackson on March 18, 1997, while investigating a homicide, and took Jackson into custody based on an outstanding misdemeanor warrant. Detective Green wrote that he began to interview Jackson, who stated that he and Tucker had made amends and that she did not want to press charges. Detective Green responded that he would contact Tucker after the interview. Jackson then waived his Miranda[5] rights and described the circumstances surrounding the alleged burglaries. At the end of the report, Detective Green wrote that he contacted Tucker, who affirmed that she wanted the burglary charges to be dropped. Detective Green then stated in his report that the burglary cases would be closed because the victim did not want Jackson prosecuted.
Additional documents concern an investigation of Jackson for the offense of throwing a deadly missile. One of the documents is a police report dated May 27, 1997, describing the incident. The report states that an officer encountered a man who was bleeding from his right ear. The man told the officer that someone had thrown a cement block through his car window. Shortly thereafter, Jackson arrived on the scene and the man stated that Jackson was the one who threw the block. Jackson denied the accusation, but was placed under arrest and charged with throwing a deadly missile. The report states that the officer could not locate any other witnesses to the incident. Also included is a letter from the State Attorney’s Office dated August 11, 1997, discussing the office’s recommendation that no information be filed against Jackson due to a lack of corroborating evidence.
Based on the documents described above, Butler has not established that Jackson’s testimony was procured in exchange for any promise of leniency in his criminal cases. The documents in fact show the opposite; Jackson’s burglary charges were dropped because the victim decided not to press charges, while the charge of throwing a deadly missile was dropped due to a lack of corroborating evidence. Under these circumstances, even if Butler’s trial attorneys had investigated Jackson more thoroughly, Butler has not demonstrated that they would have discovered any evidence that would have aided his case. Accordingly, we find *654 that Butler has not established prejudice under Strickland.
As to Butler’s argument that trial counsel failed to impeach Jackson concerning inconsistencies between his initial statement and his testimony at trial, the postconviction court determined that the two statements were not inconsistent. In his trial testimony, Jackson explained that he and his brother encountered Butler in front of the Blue Chip Bar and that Butler asked for a ride to the bank. Jackson stated that while they were driving, Butler told him that he was going to kill Bay and Red. Butler asserts that in Jackson’s statement to Detective Green, Jackson inconsistently claimed that he did not drive Butler anywhere. The postconviction court rejected any claim of deficiency on the part of Butler’s attorneys, observing:
Looking at Jackson’s statement to the police in full context, however, it appears that the detective was at that time asking Jackson if he aided Butler in the murder in any way, and so it is unclear whether the detective is asking Jackson if he drove Butler on March 12, 1997, or two nights later when the murder occurred.
The postconviction court’s description accurately characterizes Jackson’s interview with Detective Green. The relevant portion of the interview states:
Q. Did you in any way help Harry? Drive Harry to the scene?
A. No.
Q. Did you take any items to hide for Harry?
A. No.
Q. Did you see Harry with any weapons at all?
A. No.
While this exchange occurred immediately after Detective Green asked Jackson to describe the events of Wednesday, March 12 (the day Jackson claimed Butler made the statement that he wanted to kill Fleming and Miller), it is clear that Detective Green’s question — whether Jackson “dr[ove] Harry to the scene” — was directed toward the murder itself. Because the statements are not inconsistent, trial counsel’s failure to raise the issue during cross-examination was not deficient and did not result in prejudice to Butler.
4. Conflict of Interest
In his fourth claim, Butler contends that he was denied effective assistance of counsel due to a conflict of interest between himself and attorney Anne Borghetti, who had previously represented witness Terry Jackson in a criminal case. Butler argues that because Borghetti was ethically prohibited from revealing information she learned about Jackson in the course of her representation, and because Jackson was a material witness at Butler’s trial, Borghetti’s failure to disclose her prior representation prejudiced Butler’s defense and violated his right to conflict-free counsel. The following standard of review applies to Strickland claims based upon an alleged conflict of counsel:
[I]n order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must “establish that an actual conflict of interest adversely affected his lawyer’s performance.” A lawyer suffers from an actual conflict of interest when he or she “actively represents] conflicting interests.” To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. A possible, speculative or merely hypothetical conflict is “insufficient to impugn a criminal conviction.”
Hunter v. State, 817 So.2d 786, 791-92 (Fla.2002) (citations omitted) (quoting *655 Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).
Here, the evidence submitted to the posteonviction court established that Borghetti was appointed to represent Jackson regarding the charge of throwing a deadly missile on June 19, 1997, after the Public Defender’s Office withdrew from Jackson’s case. Borghetti filed a notice of appearance on June 26. The letter from the State Attorney’s Office declaring its intention not to prosecute Jackson on that charge is dated August 11. Borghetti filed a notice of appearance in Butler’s case approximately five months later, on January 15, 1998. At the posteonviction evi-dentiary hearing, Borghetti acknowledged that her signature appeared on the June 26 notice of appearance. However, she testified that she had no recollection of representing Jackson, or even of speaking with him, and stated that her records contained no file under his name. She explained that she was on the conflict counsel list at that time, and assumed that she was appointed to represent Jackson because of the withdrawal of the Public Defender’s Office, but noted that she found no record of ever appearing in court on Jackson’s behalf.
Based on this evidence, Butler has not established that an “actual conflict of interest adversely affected his lawyer’s performance.” Hunter, 817 So.2d at 791 (quoting Cuyler, 446 U.S. at 350, 100 S.Ct. 1708). As the posteonviction court determined in denying this claim,
[A]ll evidence appears to indicate that all Borghetti did on the Jackson case was file a boilerplate notice of appearance before the State filed its notice that no information would be filed, that Bor-ghetti did not even recall having briefly appeared in Jackson’s case before representing Butler, and did not realize that there was any connection between the two men.
Because there is no evidence in the record suggesting that Butler’s interests were compromised by Borghetti’s prior representation of Jackson, we affirm the post-conviction court’s decision.
5. Unidentified Print
Butler’s next claim is based on the post-conviction testimony of Carol Beauchamp, a latent print examiner with the Pinellas County Sheriffs Office. Beauchamp (née Davis) testified at Butler’s trial concerning latent prints recovered from the crime scene. At trial, Beauchamp testified that 113 prints were recovered from the crime scene, in the form of both lifts and photographs. Of those 113 prints, eighty-four had no comparable value, twenty-one were unidentified, and eight positive identifications were made. Three of the identified prints were from Harry Butler, four were from Leslie Fleming, and one was from one of Fleming and Butler’s daughters. During posteonviction proceedings, Beau-champ testified concerning one of the twenty-one unidentified prints. The print was found on a telephone at the crime scene, was in blood, and appeared to Beau-champ to be a partial palm print. Beau-champ said that she compared the print to available print sets from the defendant, the victim, and other individuals, but was unable to make a positive identification.
Butler now argues that his trial counsel rendered ineffective assistance by failing to discover this print and by failing to alert the jury of its significance. Butler asserts that because the print was in the victim’s blood, it could only have been left at the time of the murder. Thus, the print supported trial counsel’s argument that the murder was committed by an unidentified third person, and provided evidence that an unidentified person was at the scene of *656 the crime. In the alternative, Butler argues that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the existence of the bloody print. The postconviction court found both claims to be without merit, and we agree.
a. Brady Claim
Initially, we address the State’s alleged failure to disclose evidence concerning the print and find Butler’s claim unsupported by the record. Under the decision of the United States Supreme Court in Brady, “the State is required to disclose material information within its possession or control that is favorable to the defense.” Floyd, 18 So.3d at 450. To prove the existence of a valid Brady claim, a defendant must demonstrate “(1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.” Rodriguez v. State, 39 So.3d 275, 285 (Fla.2010) (quoting Riechmann v. State, 966 So.2d 298, 307 (Fla.2007)). To show that the defendant was prejudiced by the suppression of evidence, “the defendant must demonstrate ‘a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.’ ” Floyd, 18 So.3d at 450 (quoting Smith v. State, 931 So.2d 790, 796 (Fla.2006)).
As to the second prong, “this Court has explained that ‘[t]here is no Brady violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence.’” Floyd, 18 So.3d at 451 (quoting Provenzano v. State, 616 So.2d 428, 430 (Fla.1993)). In this case, the record establishes that evidence concerning the bloody print was not withheld from the defense. Beauchamp testified that she provided copies of all identifiable prints, as well as a copy of her report containing the results of all fingerprint comparisons, to the defense. Additionally, attorney Watts testified that evidence concerning the print was included in the materials provided to the defense and was further mentioned in the deposition of Donald Barker, the investigator who documented the print at the crime scene. Under these circumstances, evidence of the print was clearly available to the defense. Accordingly, Butler has failed to establish that evidence was “willfully or inadvertently suppressed by the State.” Rodriguez, 39 So.3d at 285. Thus, Butler’s Brady claim is without merit.
b. Strickland Claim
As to Butler’s Strickland claim, the trial court held that the failure of counsel to highlight the significance of this print to the jury did not result in sufficient prejudice to warrant relief. Again, this conclusion is supported by the evidence presented at trial and in the postconviction record. Butler’s prejudice argument is based on his contention that the existence of the bloody print supported his attorneys’ argument at trial that the murder was committed by an unidentified third person. However, according to Beau-champ’s postconviction testimony, the print did not conclusively establish that a third person was at the crime scene.
Beauchamp stated that the print appeared to her to be a partial palm print. She explained that while she compared the print to print sets from the victim, the defendant, and numerous other individuals, she was not able to identify its source. However, Beauchamp also explained that the area of the palm between the thumb and forefinger, which a person would use in grabbing an item, is not included on a standard set of fingerprint cards, but rath *657 er is only included if major case prints are taken. Beauchamp said that she did not have a set of major case prints from Leslie Fleming. Thus, she was unable to exclude the victim as a source of the print. Furthermore, Shawna Fleming, the victim’s sister, testified that when she discovered Leslie’s body on the morning of March 14, 1997, the body was next to the phone. As the postconviction court also observed, Beauchamp testified that Dennis Tennell and Adonis Hartsfield, the two possible alternative perpetrators identified by the defense, were conclusively eliminated as sources of the print.
In light of the fact that the victim could not be eliminated as a source of the bloody print, this evidence provides little support for the defense’s argument that an unidentified third person was present at the scene of the murder. Nor does the print negate or weaken other evidence of Butler’s guilt, particularly Butler’s statement that he intended to kill Leslie Fleming, LaShara Butler’s identification of her father, and the fact that the victim’s blood was found on Butler’s shoes. Accordingly, counsel’s failure to bring the print to the jury’s attention does not undermine confidence in the result of the proceedings, and we affirm the postconviction court’s denial of relief.
6. Medical Examiner’s Testimony
Butler’s sixth Strickland claim is based on the asserted failure of his trial counsel to object to testimony by medical examiner Dr. Marie Hansen during the guilt phase. The challenged statements were made during redirect examination. Dr. Hansen was asked by the State to define the phrase “torturous wounds,” which she did. When asked whether the victim’s injures were torturous wounds, Hanson replied, “[T]hey could be consistent with torture wounds, yes.” Butler argues that counsel should have objected to this statement as irrelevant and speculative. He further argues that because Dr. Hansen is not an expert in neurology, she was not qualified to testify as to whether the victim was in pain.
Below, the postconviction court rejected Butler’s claims. As to the issue of relevance, the court found that, during cross-examination, defense counsel questioned Dr. Hansen concerning the possibility that the victim was unconscious when the wounds were inflicted. The postconviction court determined that in discussing the issue of torturous wounds, the State was attempting to establish that the victim was in fact conscious. As to Dr. Hansen’s qualifications, the court observed that “[although Dr. Hansen testified that tortuous [sic] wounds hurt, she did not express any opinion as to whether the victim suffered; her testimony regarding tortuous [sic] wounds simply dealt with the possibility that the victim could have been conscious.” Thus, the court concluded that the testimony was not irrelevant or improper, and that any objection would have been rejected by the trial court. See Hitchcock, 991 So.2d at 361 (“Counsel cannot be deemed ineffective for failing to make a meritless objection.”).
These conclusions are supported by the record. On direct examination, Dr. Hansen described the extent and nature of the victim’s wounds. She testified that the victim suffered twenty-five stab wounds, nine incised wounds, and eleven wounds that could not be labeled. Some of these wounds were defensive in nature. Additionally, the victim exhibited swelling on her face and a fractured jaw, which Dr. Hanson explained was consistent with being struck with blunt force. Multiple stab wounds were observed on the victim’s neck. Two of these wounds would have been fatal, causing the victim to bleed to death or causing her lungs to collapse. *658 Dr. Hanson also observed hemorrhage marks on the victim’s neck, which were consistent with strangulation, asphyxiation, or suffocation.
On cross-examination, the defense questioned Dr. Hanson as to whether the victim might have been unconscious when many of the wounds were inflicted. Dr. Hansen explained that defensive wounds were indicative of consciousness or semi-consciousness, but otherwise agreed that there was no way to determine the order in which the victim’s injuries were inflicted. Dr. Hansen agreed that with the exception of the defensive wounds, the victim could have been unconscious when the injuries were inflicted. On redirect examination, the State asked Dr. Hansen to explain to the jury the definition of a “torturous wound.” She explained that torturous wounds are small wounds in the skin made in order to hurt or threaten a person. Dr. Hansen stated that some of the wounds on the victim’s chest, abdomen, and neck could be consistent with torturous wounds. The State then questioned Dr. Hansen concerning the length of time it would take to render a person unconscious from asphyxiation. Dr. Hansen responded that it would take “up to a couple minutes” if pressure to the neck were continuously applied. The State then asked, “Why would someone keep stabbing someone if they were unconscious?” The defense objected to the question as speculative, and the court sustained the objection.
Although the trial court sustained the defense’s objection to the State’s final question, we agree with the postconviction court that the overall inquiry was relevant to the issues raised during the direct and cross-examinations of Dr. Hansen. The defense sought to establish that the victim may have been unconscious when many of the wounds were inflicted. In response, the State sought to establish that the wounds were torturous in nature, indicating that the perpetrator inflicted the injuries in an effort to inflict pain on a conscious victim. Further, contrary to Butler’s argument, Dr. Hansen did not testify that the wounds in fact caused the victim pain, but only that they were “consistent with” the type of wounds inflicted with the intent of causing pain. Because this testimony was not irrelevant or improper, any objection would have been overruled. Because “[c]ounsel cannot be deemed ineffective for failing to make a meritless objection,” Hitchcock, 991 So.2d at 361, we affirm the postconviction court’s denial of relief.
7. Defense Counsel’s Opening Statement
Seventh, Butler argues that trial counsel rendered ineffective assistance based on a statement made by defense attorney Richard Watts. In the defense’s guilt phase opening statement, Watts argued that Butler did not kill Leslie Fleming, that Butler’s prosecution was the result of a rush to judgment by law enforcement, and that the jury would observe deficiencies in the State’s evidence due to the State’s failure to conduct a sufficient investigation of the murder. In the course of the opening statement, Watts incorrectly informed the jury that blood was discovered on a sliding glass door at the victim’s home containing DNA that belonged to neither Butler nor the victim. Watts further asserted that the blood on the door belonged to the real killer. In actuality, the blood was not found at Fleming’s home, but was instead found on a door at the apartment where Butler was living at the time of the murder. The State addressed the defense’s mistake in its closing argument, emphasizing that all the blood found at the crime scene belonged to the victim and that there was no way to tell when the blood *659 found in Butler’s apartment was deposited there.
Butler asserts that this error deprived him of a fair trial by undermining the defense’s credibility with the jury. Below, the postconviction court rejected Butler’s claim, finding no reasonable possibility that the error impacted the result of the trial. We agree. First, as the post-conviction court observed, Watts’ statement was brief and did not become a focus of the trial. Secondly, defense attorney Michael Schwartzberg acknowledged the error in his closing argument and sought to use it in the defense’s favor. During closing, Schwartzberg reiterated the defense’s position that the arrest and prosecution of Butler was the result of a rush to judgment by police. Schwartzberg admitted that the blood referred to in opening argument was found at Butler’s apartment rather than Fleming’s home. However, he noted that while the blood had been tested against DNA samples from Butler and Fleming, it had not been tested against the DNA of other individuals involved in the case. Schwartzberg argued that law enforcement’s failure to thoroughly evaluate the evidence provided further support for the defense’s argument that law enforcement did not conduct a sufficient investigation.
Based on this record, we agree that Butler has not demonstrated a reasonable probability that absent the error, the result of the proceedings would have been different. See Everett, 54 So.3d at 472. Because Butler has not satisfied the prejudice prong of Strickland, we affirm the denial of relief on this claim.
8. Butler’s Testimony
In his final claim concerning ineffectiveness of guilt phase counsel, Butler argues that counsel rendered ineffective assistance by failing to adequately prepare him to testify at trial concerning his prior felony convictions. During the guilt phase, Butler informed the jury on direct examination that he was “on [his] way to prison” when he first met the victim. On cross-examination, the State asked Butler how many felony convictions he had. Butler responded, “Approximately nine that I know of.” The State replied, “How about ten?” Butler answered, “Maybe so.” Butler contends that counsel deficiently failed to instruct him not to discuss his criminal history and to make certain that Butler was aware of the number of his prior felony convictions. The postconviction court rejected these claims, finding that counsel did not fail to prepare Butler to testify and that Butler was not prejudiced by the exchange with the State during cross-examination.
At the postconviction evidentiary hearing, Richard Watts acknowledged that he intended to bring out Butler’s prior felonies during direct examination as “anticipatory rehabilitation,” but stated that he forgot to do so. Watts said that he discussed the issue with the State before trial and that they had agreed on the number of Butler’s prior felonies. Watts stated that he informed Butler before trial that the number of his prior felony convictions, but not the nature of those felonies, could be used against him if he testified.
Based on this record, we find that Butler has not established prejudice under Strickland. With regard to counsel’s failure to tell Butler not to discuss his prior convictions, the jury was already aware prior to Butler’s testimony that Butler had been a cocaine dealer and that he was previously arrested for domestic battery against Fleming. As the postconviction court stated in denying this claim,
Given this testimony, it would hardly be a surprise to the members of the jury that Butler had, at some point in his *660 past, served time in prison. While Butler’s testimony was not helpful, this brief reference to serving time in prison cannot be said to have changed the outcome of the trial.
Similarly, with regard to counsel’s failure to bring out the number of prior felonies during direct examination and to make certain that Butler was aware of the number of his prior felonies, we find no reasonable probability of a different outcome. The difference between Butler’s answer of “approximately nine” and the State’s correction of “ten” was negligible. Because we find that Butler was not prejudiced under Strickland, we affirm the postcon-viction court’s denial of this claim.
B. Ineffective Assistance of Penalty Phase Counsel
Next, Butler argues that the post-conviction court erred in denying his claim that trial counsel rendered ineffective assistance at the penalty phase of his trial. In keeping with Strickland, “To succeed in an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense.” Lynch v. State, 2 So.3d 47, 70 (Fla.2008) (quoting Hannon v. State, 941 So.2d 1109, 1124 (Fla.2006)). “When evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant’s burden as showing that counsel’s ineffectiveness ‘deprived the defendant of a reliable penalty phase proceeding.’ ” Asay v. State, 769 So.2d 974, 985 (Fla.2000) (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). In meeting this burden, Butler “must show that but for his counsel’s deficiency, there is a reasonable probability he would have received a different sentence.” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009).
At the postconviction evidentiary hearings, it was established that Butler was originally represented in his criminal case by the Public Defender’s Office. After the Public Defender withdrew due to a conflict of interest, the trial court appointed attorneys Michael Schwartzberg and Richard Watts to represent Butler. Watts, in turn, retained attorney Anne Borghetti to assist in the preparation of Butler’s case. Watts testified during postconviction proceedings that Schwartzberg took primary responsibility for the guilt phase of trial, while he and Borghetti were responsible for gathering mitigation to present during the penalty phase.
Borghetti described the defense’s investigation of Butler’s background and its development of mitigating evidence. She testified that she interviewed Butler, reviewed his school records, and prepared an assessment of his family history and upbringing. Borghetti also interviewed members of Butler’s family, including Butler’s father Junior Butler, sister Sandra Butler, and brother Terry Butler, as well as Robin Green, Butler’s former girlfriend and the mother of three of his children, and Butler’s employer James Wood, who testified during the guilt phase. An investigator was retained, although Borghetti admitted that the investigator was not specifically assigned to develop mitigating evidence. The defense also consulted with Dr. Alfred Fireman, a forensic psychiatrist, who interviewed Butler and reviewed his medical records.[6]
*661 As to the penalty phase itself, Borghetti and Watts testified that the presentation of evidence did not go as planned. The proceeding was held on Saturday, June 27, 1998, the day after the guilt phase was completed. According to Watts, the jury was given the option of waiting until Monday to proceed with the penalty phase or to continue through the weekend, and opted to proceed on Saturday. On the morning of the penalty phase, however, many of the defense’s expected witnesses failed to arrive at court. Watts explained that he intended to call several of Butler’s friends and family members as witnesses, including Robin Green and Butler’s son, Harry, Jr. Watts said that he had considered the witnesses who failed to arrive to be the most persuasive. Nonetheless, Watts decided to go ahead with the penalty phase, concluding that the jury would have been less favorable to Butler if the proceeding was delayed. Watts also stated that in his experience reluctant witnesses are not very helpful. He felt at the time of trial that if the witnesses intentionally chose not to show up, their testimony would likely be of limited value to the defense. The defense thus proceeded with only two mitigation witnesses available: Junior Butler and Sandra Butler.
Attorney Borghetti delivered the defense’s penalty phase opening argument and conducted direct examinations of the two witnesses. During postconviction, Borghetti explained that the two witnesses turned out to be less favorable than the defense had expected. Borghetti said she had a difficult time getting Butler’s father to say anything good about him. Instead, Junior Butler was more focused on discussing his own experience of being accused of the murder of Butler’s mother. Borghetti found Sandra Butler similarly unhelpful. After describing her childhood experiences with her brother, Sandra, to the surprise of the defense, informed the jury of a dream she had the previous night in which God told her that Butler was guilty of the murder of Leslie Fleming. In his own postconviction testimony, Watts agreed with Borghetti that the presentation of mitigating evidence did not go well. He said that as a result of his experience in Butler’s case, he now retains a mitigation specialist in every capital case and always places his expected penalty phase witnesses under subpoena.
Following the testimony of Sandra Butler, the defense requested and the court granted a brief recess while the defense waited for Robin Green to arrive. When Green failed to arrive by the end of the recess, the defense rested. The defense’s closing argument was delivered by attorney Schwartzberg, who argued that Butler was under the influence of alcohol and cocaine on the night of the murder, which supported a finding that he was under the influence of extreme mental or emotional disturbance at the time of the offense. See § 921.141(6)0»), Fla. Stat. (1997). Schwartzberg relied in part on Butler’s own guilt phase testimony, as well as on the testimony of other witnesses who had observed Butler using large amounts of alcohol and cocaine on the night of the murder. Citing the testimony of Junior and Sandra Butler, Schwartzberg also argued that Butler grew up without his mother, that his grandmother also died when he was young, and that Butler had a troubled childhood. Schwartzberg further argued that Butler was a good son, a good father, and suffered from a long-term substance abuse problem. In addition, Schwartzberg highlighted the guilt phase testimony of Butler’s employer and coworkers that Butler was a hard worker *662 and well regarded. Nonetheless, at the end of the penalty phase the jury returned a recommendation in favor of death by a vote of eleven to one.
At a Spencer hearing several months later, the defense presented mental health testimony by Dr. Michael Maher, a psychiatrist.[7] The trial court issued its sentencing order on January 11, 1999. In following the jury recommendation, the court found one aggravator, that the murder was especially heinous, atrocious or cruel, which the court assigned “great weight.” As to the proposed statutory mitigation, the trial court rejected the defense’s argument that Butler was under the influence of extreme mental or emotional disturbance when the crime was committed. The trial court next addressed and assigned weight to the following nonstatuto-ry mitigating circumstances: (1) Butler was reared without his natural mother (some weight); (2) Butler had a troubled childhood (rejected); (3) Butler is a hard worker (rejected); (4) Butler is a good and loving father (rejected); (5) Butler is a good and loving son (some weight); (6) Butler is well thought of by neighbors and coworkers (slight weight); (7) Butler has a long-term substance abuse problem (slight weight).
In rejecting and assigning weight to several of the proposed mitigators, the trial court cited a lack of evidence. With regard to counsel’s contention that Butler had a troubled childhood, the court observed that the only evidence supporting the aggravator was the testimony of Butler’s father that the family was poor. The court observed, “Poverty is not a per se indicator of a troubled childhood, and the defendant offered no other evidence to convince the Court that this circumstance exists.” In assigning slight weight to the mitigator that Butler is well thought of by neighbors and coworkers, the court “note[d] that the court file is devoid of letters or notes in support of the defendant.” As to Butler’s long-term substance abuse problem, the court found that the only evidence supporting the mitigator was Butler’s own testimony. In determining that death was an appropriate sentence, the trial court explained that the aggravation was substantial while the mitigating circumstances were relatively minor.
Following this Court’s affirmance of Butler’s conviction and death sentence, Butler filed his rule 3.851 motion for post-conviction relief. Regarding his claim of penalty phase ineffectiveness, Butler specifically alleged that his trial counsel rendered deficient performance by failing to conduct a sufficient investigation of his upbringing and family background, failing to retain and present a mitigation specialist, failing to place penalty phase witnesses under subpoena, and failing to retain and present a mental health expert. Butler alleged in the motion that trial counsel should have discovered and presented mitigating evidence concerning his abandonment and emotional cut-offs during early childhood, chaotic family environment as a *663 child, socioeconomic and educational deprivations during childhood, inadequate coping skills and impulse control, substance abuse, mental and emotional disorders, and possible brain damage.
At the November 2008 evidentiary hearing, Butler presented witness testimony in support of his rule 8.851 motion. Maude Brown, Butler’s great-aunt, and Annie Brookins, who was related by marriage to a member of Butler’s extended family, testified concerning Butler’s family background and the circumstances of his childhood. Both explained that Butler was raised on a tobacco farm in rural Georgia, that conditions on the farm were poor, lacking running water or electricity, and that the children would begin working on the farm at age six or seven and had limited access to education. Butler’s mother died in an apparent drowning accident when Butler was three years old, and Butler and his siblings were largely raised by their grandmother. Butler’s grandmother later died when Butler was ten years of age, at which time Butler was sent to live with his father in Florida. Brookins testified that Butler played football in high school, got along well with other children, and seemed happy despite the family’s poverty. Brown testified that she had little contact with Butler when he lived in Florida and did not know him as an adult.
Shirley Furtick, a social worker, conducted a biopsychosocial assessment of Butler and testified as an expert in clinical social work. Based on her investigation, Furtick provided the postconviction court with additional details concerning conditions on the farm where Butler was raised as well as Butler’s personal history. Like Brown and Brookins, Furtick described conditions on the farm as very poor. The children lived in a two-bedroom shack belonging to Butler’s grandmother which lacked electricity or running water. The children were awoken early in the morning to work in the tobacco fields and were sometimes beaten by their grandparents if they failed to do so. They were often undernourished and lacked clothes. Following the death of Butler’s grandmother, Butler and his siblings lived with their father in Florida. Furtick stated that Junior Butler often left his children alone and that Butler was mostly raised by his older brother Terry, until Terry was arrested and sent to prison when Butler was fourteen years old. Furtick testified that Butler attended high school in Florida, where he was a good football player but a poor student. Butler dropped out of high school shortly before the twelfth grade because an injury prevented him from playing football. Butler’s then girlfriend, Green, became pregnant when he was eighteen years old and he took various jobs to support her. Butler began selling drugs as well as using crack cocaine, and Green eventually ended the relationship.
Butler also presented testimony by Dr. Glenn Caddy, a clinical and forensic psychiatrist. Dr. Caddy interviewed Butler three times, reviewed his school and medical records, and consulted with Furtick concerning Butler’s childhood and family history. Dr. Caddy said that Butler described himself as a “happy-go-lucky kid.” However, Dr. Caddy learned that Butler’s mother reportedly drank alcohol when she was pregnant, that Butler observed a lot of violence as a child, and that as a child Butler had an extreme fear of the dark and suffered from stuttering and bed wetting. Butler began using alcohol in his early teen years and drank heavily as an adult. Dr. Caddy stated that Butler refused to submit to an IQ test but agreed to other psychological and intellectual testing. Dr. Caddy determined that Butler functions at a third-grade level in reading, a second-grade level in spelling, and a fifth- *664 grade level in arithmetic. Dr. Caddy also determined that Butler suffers from “serious impairment” in abstract reasoning ability and scored in the ninth percentile of adults in memory function.
In its order denying relief, the postcon-viction court found neither deficiency nor prejudice. As to deficiency, the court found that Butler’s trial attorneys conducted a sufficient investigation of Butler’s background and made a reasonable strategic decision to go forward with the penalty phase as scheduled. The court also rejected Butler’s claim of deficiency regarding the failure to hire a mental health expert, finding that the evidence showed that trial counsel did retain Dr. Fireman to conduct a mental health evaluation of Butler and, based on the results of that evaluation, elected not to present his findings. The court further determined that Butler was not prejudiced by any failure to conduct a more thorough presentation of mitigating evidence, explaining:
[Although the defense presented extensive testimony from several witnesses to establish the existence of additional mitigating evidence not presented at trial, the essence of this testimony amounted to things already heard, in a summary fashion, during trial proceedings: that Butler grew up poor, his mother and grandmother died when he was young, he moved around due to instability caused by the deaths of his mother and grandmother, he has little education and limited intellectual abilities, and has some problems with substance abuse. The court finds that none of this additional testimony was of such significance that, had it been presented during the penalty phase, it would have persuaded either the jury to recommend life or the court to ultimately impose a life sentence in this case.
The postconviction court concluded that there was no reasonable probability that the additional testimony would have changed the outcome of the proceeding and, accordingly, denied Butler’s claim. Butler now appeals that decision.
As discussed above, to be entitled to relief before this Court Butler must satisfy both the deficiency and prejudice prongs of the Strickland test. See Lynch, 2 So.3d at 70. As the postconviction record makes clear, the penalty phase of Butler’s trial did not proceed as Butler’s counsel anticipated. Specifically, counsel admitted that they failed to take steps to ensure that their anticipated mitigation witnesses would be present at the penalty phase and did not retain a mitigation specialist to investigate Butler’s background. However, Butler bears the burden of proving not only that his attorneys were deficient, but also that he was prejudiced by such deficiency.[8] “In assessing preju *665 dice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The question this Court must address is whether, had the jury and trial judge considered the total mitigating evidence presented both at trial and during postconviction proceedings and compared it with the aggravating circumstances, there is a reasonable probability Butler would have received a sentence of life in prison. On review, we find no such probability.
With regard to the totality of available mitigating evidence, the record supports the postconviction court’s finding that the additional evidence presented at the postconviction evidentiary hearing, in essence, “amounted to things already heard, in a summary fashion, during trial proceedings.” Despite the testimony of attorneys Borghetti and Watts that many of their expected witnesses failed to arrive at court and that Junior and Sandra Butler were less helpful than the defense had hoped they would be, the defense did succeed in presenting to the jury evidence that Butler’s family was very poor, that Butler’s mother died when he was young, that Butler was raised by his grandmother until her death several years later, that Butler and his siblings were then raised by their father who had little money, and that Butler suffered from problems with drugs and alcohol. Counsel presented additional testimony concerning Butler’s substance abuse through the Spencer hearing testimony of Dr. Maher, who explained to the trial court how Butler’s cocaine use may have affected his actions on the night of the murder.
Overall, the evidence presented at the postconviction evidentiary hearing does not materially alter the sentencing profile that was presented to the jury and to the trial court. Butler argued in his rule 3.851 motion that counsel was deficient under Strickland for failing to retain a mitigation specialist and subpoena penalty phase witnesses. Butler specifically relies on the testimony of Annie Brookins, Maude Brown, and Shirley Furtick to argue that counsel failed to present evidence of his troubled childhood. While these witnesses provided more details concerning Butler’s childhood poverty than was provided at trial, the evidence suffers from the same deficiency that the trial court found in its sentencing order, namely, that “[p]overty is not a per se indicator of a troubled childhood.” Indeed, some of their testimony contradicts Butler’s claim. Although Furtick, Brown, and Brookins described the impoverished conditions of Butler’s early life, their testimony also established that from the ages of three to ten Butler was raised by his grandmother, who loved and cared for him. That Butler’s childhood was troubled is also partly contradicted by the testimony of Dr. Caddy, who said that Butler described himself as a *666 “happy-go-lucky kid.” Similarly, Brookins noted that when he lived in Florida, Butler played football and seemed happy despite his family’s poverty. Moreover, despite Butler’s contention that trial counsel was deficient for failing to subpoena penalty phase -witnesses, no evidence was presented establishing what the absent witnesses would have told the jury and the trial court.
Butler also argued in his rule 3.851 motion that trial counsel was deficient for failing to present testimony concerning mental health mitigation. We agree with the postconviction court that the evidence of mental health issues presented at the postconviction evidentiary hearing was not “of such significance that, had it been presented during the penalty phase, it would have persuaded either the jury to recommend life or the court to ultimately impose a life sentence in this case.” The only mental health testimony presented in post-conviction, that of Dr. Caddy, concerned Butler’s poor intellectual abilities and drug and alcohol abuse. As to the evidence of drug and alcohol abuse, the jury was already made aware through the guilt phase testimony of Butler and other witnesses that Butler had used large amounts of alcohol and cocaine on the night of the murder. With regard to Butler’s intellectual abilities, while Dr. Caddy testified that Butler performs at a low level in reading, spelling, and arithmetic and suffers from poor memory function, he did not state that these deficiencies would have supported a finding, as trial counsel argued during the penalty phase, that Butler was under the influence of extreme mental or emotional disturbance. Further, Dr. Caddy did not connect these deficiencies to the crime itself or explain how they would have affected Butler’s actions at the time of the murder. See Rutherford v. State, 727 So.2d 216, 224 (Fla.1998) (finding mental health testimony to be of limited mitigating value where experts failed to connect the defendant’s deficiencies to the murder). As in Rutherford, there was no evidence that Davis’s intellectual deficits “contributed to his actions in effecting the murder.” Id.[9]
While trial counsel’s failure to present mitigating evidence may under some circumstances entitle a defendant to a new penalty phase, the evidence must be of *667 such significance that its absence has resulted in the deprivation of a reliable sentencing proceeding. See, e.g., Hildwin v. Dugger, 654 So.2d 107, 109-10 (Fla.1995) (finding both deficiency and prejudice under Strickland where trial counsel “failed to unearth a large amount of mitigating evidence,” including two weighty statutory mitigating circumstances). By contrast, where the additional mitigation is minor or cumulative and the aggravating circumstances substantial, we have held that confidence in the outcome of the penalty phase is not undermined. See, e.g., Breedlove v. State, 692 So.2d 874, 877-78 (Fla.1997) (finding no prejudice under Strickland where mitigating evidence presented in postconviction, particularly testimony concerning the defendant’s drug addiction and beatings by his father, would not have changed the outcome in fight of substantial aggravation in the record); see also Asay, 769 So.2d at 988 (“[T]his Court has reasoned that where the trial court found substantial and compelling aggravation, ... there was no reasonable probability that the outcome would have been different had counsel presented mitigation evidence of the defendant’s abused childhood, history of substance abuse, and brain damage.”).
In this ease, although the trial court found only a single aggravating circumstance — that the murder was especially heinous, atrocious, or cruel — that aggravator was particularly weighty. In concluding that the aggravator was entitled to great weight, the trial court summarized the evidence on which it relied as follows:
The evidence showed that Ms. Fleming was brutally stabbed, slashed, beaten, strangled, suffocated, and left for dead while her three little girls slept just down the hall. According to the medical examiner, she was stabbed or slashed with a sharp instrument 45 times on her neck, torso, and lower abdomen. Twenty-five of the wounds were deep stab wounds, and twenty of the wounds were wide, elongated incised wounds. There were so many wounds, in fact, that the medical examiner testified that “after a while describing them you run out of new words to describe them with.” Some of the wounds were consistent with “torturous wounds” designed to torture or terrorize a victim. Ms. Fleming, the medical examiner testified, had such wounds on her neck, chest, and abdomen. Some of her wounds were “defensive wounds” inflicted when a victim tries to shield vital body parts from an attacker. A victim is, by definition, alive and conscious when such wounds are inflicted. Ms. Fleming had six of these wounds on her hands, and additional arguable defensive wounds on her arms. One stab wound went through her wrist. In addition to the stabbing and slashing, Ms. Fleming was beaten. The medical examiner testified that she had a fractured jaw, bruises in her mouth, swelling of her face and lips, and abrasions on her upper and lower lips. In addition to the stabbing and slashing and beating, Ms. Fleming was strangled. The medical examiner found petechiae in her left eye, a symptom consistent with pressure injury to the neck. Finally, a plastic bag was found on Ms. Fleming’s face. A pillow was on the floor next to her face. The fatal wound, in the medical examiner’s opinion, was a stab wound to the side of the neck which caused Ms. Fleming to bleed to death. The entire episode lasted ten minutes or more, the medical examiner estimated.
As we have observed, HAC is considered one of the weightiest aggravators in the statutory scheme. See Aguirre-Jarquin v. State, 9 So.3d 593, 610 (Fla.2009). Given the extreme and prolonged nature of *668 the assault and murder in this case, we find that the HAC aggravator far eclipses the evidence concerning Butler’s disadvantaged upbringing, intellectual deficits, and substance abuse.
Under these circumstances, we find no reasonable probability that the additional mitigating evidence would have convinced five jurors to change their recommendations from death to life imprisonment. See Hodges v. State, 885 So.2d 338, 351 (Fla.2004) (“Even with the postconviction allegations regarding Hodges’ upbringing, it is highly unlikely that the admission of that evidence would have led four additional jurors to cast a vote recommending life in prison.”). Because the evidence presented at the postconviction evidentiary hearings does not undermine confidence in the outcome of the proceedings, we find that Butler cannot satisfy the prejudice prong of Strickland. Accordingly, we affirm the postconviction court’s denial of relief.
C. Cumulative Error
Finally, Butler argues that the combination of errors asserted above deprived him of a fundamentally fair trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. As we have determined, however, none of Butler’s individual claims of ineffectiveness of counsel warrant relief. “Where, as here, the alleged errors urged for consideration in a cumulative error analysis ‘are either meritless, procedurally barred, or do not meet the Strickland standard for ineffective assistance of counsel[,] ... the contention of cumulative error is similarly without merit.’ ” Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (alteration in original) (quoting Israel v. State, 985 So.2d 510, 520 (Fla.2008)).
III. HABEAS CORPUS
Having concluded that the claims raised in Butler’s appeal from the denial of his rule 3.851 motion for postconviction relief are without merit, we now turn to Butler’s petition for writ of habeas corpus.
A. Ineffective Assistance of Appellate Counsel
In his first two habeas claims, Butler argues that his appellate counsel rendered ineffective assistance by (1) failing to argue on direct appeal that the trial court erred in allowing LaShara Butler to testify as a witness, and (2) failing to file a petition for writ of certiorari with the United States Supreme Court following this Court’s affirmance of his conviction and death sentence. “Claims of ineffective assistance of appellate counsel are properly raised in a petition for writ of habeas corpus.” Floyd, 18 So.3d at 458. Consistent with Strickland, to determine whether a petitioner is entitled to relief based on a claim of ineffective assistance of appellate counsel, this Court must evaluate, first, “whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling outside the range of professionally acceptable performance,” and second, “whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.” Cox v. State, 966 So.2d 337, 365 (Fla.2007) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)).
“The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Anderson v. State, 18 So.3d 501, 520 (Fla.2009) (quoting Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000)). “Appellate counsel cannot be deemed ineffective for failing to raise meritless issues.” Id. at 521. “In fact, appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; *669 effective appellate counsel need not raise every conceivable nonfrivolous issue.” Valle v. Moore, 837 So.2d 905, 908 (Fla.2002). Thus, where a habeas petitioner argues that appellate counsel was ineffective for failing to raise an issue, the claim •will not warrant relief if the issue “ ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal.” Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
1. LaShara Butler
We first address Butler’s claim that his appellate counsel rendered ineffective assistance by failing to argue on direct appeal that the trial court erred in allowing LaShara Butler to testify at trial. As we explained above in addressing Butler’s claim of ineffectiveness of trial counsel, “In Florida, whether a child witness is competent to testify is based on ‘his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth.’ ” Floyd, 18 So.3d at 443 (quoting Lloyd v. State, 524 So.2d 396, 400 (Fla.1988)). The decision to permit a child witness to testify is a matter within the discretion of the trial judge and is thus reviewed on appeal only for abuse of discretion. See id. at 444. Because we find that the trial court did not abuse its discretion in admitting LaShara’s testimony, we conclude that appellate counsel was not ineffective for failing to raise this issue.
As discussed previously in this opinion, the trial court conducted an extensive evaluation of LaShara’s competency. The presiding trial judge personally questioned LaShara concerning her ability to recall and discuss facts about her life and things she had observed when she was six years old, whether she could tell the difference between the truth and a he, whether she understood when something is make-believe, whether she knew the consequences of telling a lie, and whether she was able to take an oath and make a promise to tell the truth. The trial judge concluded that LaShara was “bright, articulate, [and] well able to express the things she has observed,” and accordingly ruled that she would be permitted to testify.
We addressed a closely related claim in Floyd. There, the defendant argued that his trial counsel was ineffective under Strickland for failing to investigate and challenge the competency of two child witnesses. We held in part that Floyd could not establish prejudice because the two witnesses were properly evaluated and admitted by the trial court. Reviewing the record, we observed:
LaJade proved her intelligence level by correctly counting numbers and reciting the alphabet. She also understood her obligation to tell the truth “no matter what.” Likewise, J.J. established his intelligence in that he stated his education level and the subjects he studied in school, and he made an earnest effort to pass the judge’s “quiz” on mathematics. J.J. also understood the concept of lying, the consequence of lying, and his obligation to tell the truth. Finally, J.J. promised to answer each question truthfully. Based on their answers, the trial court properly concluded that LaJade and J.J. were competent witnesses, and any objection presented by trial counsel would have been meritless. See Baker [v. State], 674 So.2d [199], 200-01 [(Fla. 4th DCA 1996)] (finding no abuse of discretion where the trial court qualified a six-year-old child after the child demonstrated that she knew her age, where she went to school, where she went to church, and the colors of clothing; the child established that she possessed a *670 sense to tell the truth; and the child stated that she knew it was wrong to lie).
Floyd, 18 So.3d at 444-45.
The trial court asked similar questions and made similar findings in this case. As in Floyd, the record demonstrates that the trial court did not abuse its discretion in finding that LaShara was competent to testify. Because appellate counsel cannot be deemed ineffective for failing to raise a meritless issue, we deny habeas relief as to this claim.
2. Petition for Writ of Certiorari
Additionally, Butler argues that his appellate counsel rendered ineffective assistance by failing to file a petition for writ of certiorari with the United States Supreme Court after his conviction and sentence were affirmed by this Court on direct appeal. Butler’s claim is without merit, however, because the Supreme Court has held that “a criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals or applications for review in [the Supreme] Court.” Wainwright v. Torna, 455 U.S. 586, 587, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982).
In Wainwright, a Florida inmate filed a petition for writ of habeas corpus in federal district court. Wainwright alleged that after his conviction and sentence were affirmed by the Third District Court of Appeal, his attorney filed a petition for review in this Court, which was denied as untimely. Wainwright argued that his counsel’s failure to timely file the petition constituted deficient performance under Strickland. The federal district court denied the petition. See Wainwright, 455 U.S. at 586-87, 102 S.Ct. 1300. On granting review, the United States Supreme Court similarly rejected Wainwright’s argument, observing that, as with petitions for certiorari filed in the United States Supreme Court, petitions for review in the Florida Supreme Court are discretionary. Citing its decision in Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), the Supreme Court observed that criminal defendants do not have a constitutional right to counsel to pursue discretionary state appeals or applications for review by the United States Supreme Court. The High Court concluded: “Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel’s failure to file the application timely.” Wainwright, 455 U.S. at 587-88, 102 S.Ct. 1300.
Here, like Wainwright, Butler alleges that deficient conduct by his appellate counsel resulted in counsel’s failure to seek discretionary review after the denial of relief in his direct appeal. However, just as Wainwright had no constitutional right to the aid of counsel in seeking discretionary review in this Court, Butler had no constitutional right to the aid of counsel in seeking review in the United States Supreme Court. Since Butler had no constitutional right to counsel, he cannot claim here that counsel’s deficiencies deprived him of that right.[10] Accordingly, we deny habeas corpus relief as to this claim.
B. Constitutionality of Florida’s Lethal Injection Protocol
Butler next argues that Florida’s present method of execution by lethal injection *671 entails an unconstitutional level of risk that it will cause extreme pain in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Butler’s only factual allegation supporting this claim is a reference to the December 2006 execution of Florida inmate Angel Diaz. In Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007), this Court discussed the facts surrounding the Diaz execution and upheld Florida’s revised lethal injection protocol against an Eighth Amendment challenge. Subsequently, in Ventura v. State, 2 So.3d 194 (Fla.2009), we held that Florida’s lethal injection protocol survived constitutional scrutiny under each of the Eighth Amendment standards articulated by the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). More recently, in Valle v. State, 70 So.3d 530 (Fla.2011), we rejected a condemned inmate’s argument that the Florida Department of Corrections’ substitution of pentobarbital for sodium thiopental in its lethal injection procedure rendered Florida’s method of execution unconstitutional.
We explained in Valle that a “a condemned inmate’s burden of proof for mounting a successful Eight Amendment challenge to a state’s lethal injection protocol” is governed by the standards set out in Baze:
Although acknowledging that “subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment,” the Supreme Court in Baze explained that to prevail on such a claim, condemned inmates must demonstrate that “the conditions presenting the risk must be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ ” 553 U.S. at 49-50, 128 S.Ct. 1520 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (plurality opinion); see also Brewer v. Landrigan, — U.S. —, 131 S.Ct. 445, 445, 178 L.Ed.2d 346 (2010) (“Speculation cannot substitute for evidence that the use of the drug is ‘sure or very likely to cause serious illness and needless suffering.’ ” (quoting Baze, 553 U.S. at 50, 128 S.Ct. 1520)). That is, “there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm’ that prevents prison officials from pleading that they were ‘subjectively blameless for purposes of the Eighth Amendment.’ ” Baze, 553 U.S. at 50, 128 S.Ct. 1520 (quoting Farmer v. Brennan, 511 U.S. 825, 842, 846 & n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This standard imposes a “heavy burden” upon the inmate to show that lethal injection procedures violate the Eighth Amendment. Id. at 53, 128 S.Ct. 1520 (quoting Gregg v. Georgia, 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).
Valle, 70 So.3d at 539.
Here, Butler’s only factual basis for challenging Florida’s lethal injection protocol — the execution of Angel Diaz— has previously been considered and rejected by this Court. Butler has not cited any new evidence or advanced any other claim in support of his argument that Florida’s method of lethal injection is unconstitutional. Accordingly, we deny relief. See Rigterink v. State, 66 So.3d 866, 898 (Fla.2011) (“Rigterink neither relies on any new evidence concerning the substances injected or its injection procedures, nor does he advance any claims under the United States Supreme Court’s decision in Baze.”).
C. Butler’s Competence to Be Executed
Finally, Butler argues that because he may be incompetent at the time *672 of execution, Florida’s capital sentencing statute violates the Eighth Amendment prohibition against cruel and unusual punishment. Butler acknowledges that this claim is not ripe for review and is raised here only for preservation purposes. In Nelson v. State, 43 So.3d 20, 34 (Fla.2010), and State v. Coney, 845 So.2d 120, 137 n. 19 (Fla.2003), we rejected essentially identical claims where the petitioners likewise acknowledged that their claims were not ripe for review. As this Court has explained, “a claim of incompetency to be executed cannot be asserted until a death warrant has been issued.” Green v. State, 975 So.2d 1090, 1115-16 (Fla.2008) (citing Davis v. State, 875 So.2d 359, 374 n. 9 (Fla.2003); Phillips v. State, 894 So.2d 28, 36 (Fla.2004)). Because no death warrant has been issued in this case, Butler’s claim must be denied.
IV. CONCLUSIONS
For the reasons discussed above, we affirm the trial court’s denial of Butler’s motion for postconviction relief under rule 3.851. We also deny Butler’s petition for writ of habeas corpus.
It is so ordered.
POLSTON, C.J., and LEWIS, QUINCE, and CANADY, JJ., concur.
LABARGA, J., concurring in part and dissenting in part with an opinion, in which PARIENTE and PERRY, JJ., concur.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The nonstatutory mitigating circumstances, and the weight assigned by the trial court to each circumstance, were as follows: “(1) Butler was reared without his natural mother (some weight); (2) Butler is a loving and good son (some weight); (3) Butler is well thought of by neighbors and coworkers (slight weight); and (4) Butler has a long-term substance abuse problem (slight weight).” Butler, 842 So.2d at 823.

. Butler argued that counsel rendered ineffective assistance by (1) failing to adequately use a DNA expert to evaluate the DNA evidence found on Butler's sneakers; (2) failing to retain an independent expert in the area of child competency to challenge the testimony of LaShara Butler and in failing to object to a comment by LaShara that her father had been to jail; (3) failing to sufficiently investigate and cross-examine witness Teriy Jackson; (4) failing to disclose that trial counsel Anne Borghetti had a conflict of interest due to her prior representation of Jackson; (5) failing to bring out at trial the fact that a bloody print was found on a telephone at the crime scene, or that in the alternative the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose evidence of the bloody print; (6) failing to object to the testimony of medical examiner Marie Hansen when she characterized some of the victim's injuries as "torturous wounds"; (7) erroneously arguing during opening statements that the DNA of an unidentified person was found on a door in Fleming’s home; (8) failing to adequately prepare Butler to testify; and (9) failing to adequately investigate and present mitigating evidence during the penalty phase.

. In its order denying relief, the postconviction court noted that Butler's third trial attorney, Michael Schwartzberg, had passed away in the time between Butler's trial and the postconviction evidentiary hearing and was thus unavailable to offer testimony.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Although Dr. Fireman was never called as a witness during the penalty phase, Borghetti acknowledged filing with the trial court a notice of intent to present Dr. Fireman's expert testimony concerning mental health mitigation. Borghetti did not recall the defense’s specific reasons for not calling Dr. Fireman. During his own testimony, however, attorney Watts explained that he did not believe attempting to demonstrate mental health de *661 fects would have helped Butler before the jury.

. On direct appeal, this Court summarized Dr. Maher's Spencer hearing testimony as follows:
Dr. Maher testified that he interviewed Butler concerning his use of drugs and his psychiatric background. Butler informed him that he used a lot of cocaine on the night of murder, but he also said he did not commit the murder. Dr. Maher indicated that one of the effects caused by the use of cocaine was irrational, repetitive actions. He opined that the number of stab wounds in this case suggests this type of behavior. Dr. Maher further opined that a child whose mother dies as a result of violence faces a great risk of participating in violence to resolve conflicts, especially when this factor is coupled with other dysfunctional social activities, such as drug use.
Butler, 842 So.2d at 822-23.

. In arguing that his counsel was deficient, Butler presented the testimony of Professor David Dow of the University of Houston Law Center. Professor Dow was admitted as an expert in norms and standards of attorney conduct in death penalty litigation. In discussing the sufficiency of Butler's representation at trial, Professor Dow focused on the requirements of the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines”). Although the ABA Guidelines were revised and updated in 2003, Professor Dow explained — as the United States Supreme Court has also stated — that the conduct of counsel must be evaluated under the standards that were in place at the time of the defendant’s trial. See Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 16-17, 175 L.Ed.2d 255 (2009); but see Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (observing that "[p]revailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable” in assessing attorney performance, but cautioning that "they are only guides”); see also Mendoza, v. State, 87 So.3d 644, 653 (Fla.2011) ("The ABA Guidelines are *665 not a set of rules constitutionally mandated under the Sixth Amendment and that govern the Court’s Strickland analysis. Rather, the ABA Guidelines provide guidance, and have evolved over time as has this Court’s own jurisprudence.”). Professor Dow testified that pursuant to the ABA Guidelines, the retention of a mitigation specialist was part of the minimum standard of practice for defense attorneys trying capital cases in the late 1990s. In Professor Dow's opinion, Butler’s trial attorneys were deficient for failing to retain such a specialist to investigate Butler's personal background. Professor Dow explained that a mitigation specialist would have been able to testify concerning Butler’s background even if, as in fact occurred, other potential mitigation witnesses turned out to be unhelpful or unavailable. Because we find that Butler has not established prejudice, it is unnecessary for this Court to address whether Butler has established deficiency as defined by Strickland and its progeny, and we decline to do so.

. This is not to suggest, as the dissent cautions against, that this testimony would have been of no mitigating value. Plainly, the jury and the trial court are required to consider as mitigation “any aspect of a defendant's character or record ... that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). For the purposes of assessing whether there is a reasonable probability that mental health evidence would have changed the outcome of the penalty phase, however, it is incumbent upon this Court to "reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In doing so, "it is important to focus on the nature of the mental mitigation” presented in postconviction. Rutherford, 727 So.2d at 223. Here, the mental health mitigation described by Dr. Caddy was largely confined to his conclusions that Butler has poor intellectual abilities and suffers from poor memory function. That this testimony bears little relationship to Butler's behavior in committing the murder is a relevant consideration in determining whether the jury would have recommended or the trial court would have imposed a sentence of life imprisonment. See id. at 224; see also Hannon v. State, 941 So.2d 1109, 1135 (Fla.2006) (finding no reasonable probability of a different sentence where the postconviction mental health expert most favorable to the defendant "could not translate any brain damage as having any conceptual or actual impact on Hannon's behavior, and there was no evidence to establish any nexus between Hannon's mental health and his behavior or as it related to the crimes").

. Butler's claim is distinguishable from that reviewed in Sims v. State, 998 So.2d 494 (Fla.2008). In that case, we held that in accordance with a criminal defendant’s right to the assistance of counsel on direct appeal, appellate counsel must (1) notify the defendant in a timely manner that the appellate court has issued its decision, and (2) advise the defendant of his or her right to seek discretionary review in a pro se capacity. See id. at 499, 501 n. 6. Butler does not allege that appellate counsel failed to take either action in this case.